UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAMELA WRIDT; ROBERT SAUVE; ALEIDA DELGADO; ALEIDA ROMAN; and ANDREA ORTIZ individually and on behalf of a class of all others similarly situated,<br><br>       Plaintiffs,<br><br> -against-<br><br>CITY OF NEW YORK,<br><br>       Defendant. | No. 1:25-cv-08903-ALC<br><br>**AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |

## PRELIMINARY STATEMENT

1. You are being watched. Today, throughout New York City, the police are monitoring, tracking, and cataloging you. Nearly everywhere. Nearly all the time. Video cameras—body-worn, handheld, dashboard, stationary, and aerial—are recording you. License plate readers, location trackers, and gunshot detectors are tracking you. Your biometric data, collected from DNA swabs, fingerprints, and iris scanners is being stored. Phone taps, X-ray imaging, digital record aggregation, and financial analysis tools are gathering your electronic data. Your social media is being surveilled and scraped and your online posts logged; and social network analysis is being used to map out your relationships, religious beliefs, and political affiliations.

2. The mechanism that makes this surveillance possible is the City's Domain Awareness System, or the "DAS." It is a voyeuristic policing platform that unifies into one centralized network more than a dozen technologies—public and private—including video camera systems, tracking technologies, biometric tools, data and financial aggregation analytics,

and digital communications monitors. Through the DAS, the New York City Police Department (the "NYPD" or the "department") collects the identity, location, banking details, vehicle information, social media activity, and friend groups of all who live in the city. It combines these entries with civil and criminal records and converts them into digital profiles that chart people's thoughts, plans, beliefs, and affiliations—reconstructing, in effect, the private lives of millions. It is virtually impossible to avoid.

3.     The reach of this system is neither temporary nor limited. Information collected through the DAS is stored indefinitely, with no meaningful limits on its use by the department or the agencies with which it partners. Everyone—even those never suspected of any crime—is drawn into this web of surveillance, in open defiance of the constitutional limits that protect individual liberty and privacy. From the day it was launched, the DAS has subjected New Yorkers to suspicionless, city-wide surveillance that undermines their rights. It is an unprecedented violation of American life and now stands as one of the largest surveillance networks operated anywhere in the world.[1]

4.     Despite its radical incursion into New Yorkers' privacy, the DAS has not met New York's public safety needs. New York has spent more than $3 billion amassing information that reveals the private lives of New Yorkers, including continued NYPD investment in discredited technologies. But the NYPD has failed to produce any conclusive evidence that this surveillance network has reduced crime. Despite all its invasiveness, the DAS has had no measurable impact on public safety.

---

[1]     New York City Police Department (NYPD), *Technology*, NYC.gov, About NYPD (last visited Sept. 21, 2025), https://www.nyc.gov/site/nypd/about/about-nypd/equipment-tech/technology.page (noting that the DAS "utilizes the largest networks of cameras, license plate readers, and radiological sensors in the world").

5.      Although the City has deliberately kept public information about the DAS scarce, the NYPD has revealed just enough to show that it is a digital surveillance powerhouse operating in plain sight. Those disclosures, trickled down in the press or buried in public hearings, combined with the visible presence of cameras, scanners, drones, and sensors send a chilling message: New Yorkers are being watched. As a result, Plaintiffs and millions like them have been injured and intimidated, and their rights systematically chilled. Knowing that their movements and conversations are being captured, people inevitably change how they live. They block their windows to stop the cameras installed outside their homes from seeing inside. They change their commutes to avoid traffic scanners or abandon public transit altogether to keep their home and work addresses from being tracked. They censor their speech on social media and hesitate before joining public gatherings or community associations for fear of being recorded. The DAS traces what people do today, attaches it to a permanent file of their past, and—through algorithms—projects their future activities. Thus, New Yorkers have been put on notice that if they do not modulate their public behaviors, their government has, at its fingertips, a thorough catalogue of their movements, speech, relationships, beliefs, and affiliations to use against them.

6.      Plaintiffs bring this class action based on their awareness that they, like all who live in New York City, have and will continue to be subjected to injury, intimidation, and interference in the exercise of their constitutional rights as long as the DAS remains in operation. The DAS has made a policy and practice of subjecting the entire city to extraordinary warrantless police surveillance.

7.      This civil rights class action seeks to vindicate the fundamental protections of privacy, liberty, speech, expression, and association guaranteed by the United States and New York State Constitutions. The named Plaintiffs, on behalf of themselves and a class of similarly

situated individuals (the "Class"), ask this Court to: (a) declare the City's surveillance practices unconstitutional intrusions on their rights and the rights of the Class; (b) provide relief to Pamela Wridt, Robert Sauve, Aleida Delgado, Aleida Roman, and Andrea Ortiz (collectively, "Named Plaintiffs") for the infringement of their rights; (c) enjoin Defendant from deploying the DAS against New Yorkers who are under no suspicion of criminal conduct; (d) require a warrant before the system may be searched for individuals' records; and (e) order the City to develop and enforce written policies governing the DAS, including the maintenance of an access log to prevent misuse or abuse, a data retention standard mandating the deletion of all records after 30 days, and strict limits on the sharing of DAS data with outside agencies.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs' claims arise under 42 U.S.C. § 1983, and seek redress of the deprivation, under color of state law, of rights guaranteed by the Constitution of the United States.

9.      The instant action arises under the First and Fourth Amendments to the United States Constitution and 42 U.S.C. § 1983.

10.     Jurisdiction is proper over Plaintiffs' New York State law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

11.     The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to the claims occurred in the District, and Defendant resides in this district.

**PARTIES**

12.     Plaintiff Pamela Wridt is a longtime resident of Brooklyn, New York, where she lives with her partner, Plaintiff Robert Sauve. Together, they have been subject to surveillance through the DAS in their shared Brooklyn home, online, and throughout the city.

13.     Plaintiff Robert Sauve is a native New Yorker and resident of Brooklyn, New York, where he lives with his partner, Ms. Wridt. Together, they have been subject to surveillance through the DAS in their shared Brooklyn home, online, and throughout the city.

14.     Plaintiff Aleida Delgado is a longtime resident of Brooklyn, New York. She lives in an apartment at New York City Housing Authority's ("NYCHA") Williamsburg Houses with her daughter, Plaintiff Aleida Roman. Together, they have been subject to surveillance through the DAS in their shared home, online, and throughout the city.

15.     Plaintiff Aleida Roman is a longtime resident of Brooklyn, New York, where she lives with her mother, Ms. Delgado. Together, they have been subject to surveillance through the DAS in their shared home, online, and throughout the city.

16.     Plaintiff Andrea Ortiz is a longtime resident of Brooklyn New York. She is an educational policy specialist and advocate who works with students, parents, and teachers across New York City's public schools. She has been subject to surveillance through the DAS at home, online, and throughout the city.

17.     Defendant City of New York ("Defendant" or the "City") is and was at all relevant times a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, the NYPD, which acts as its agent in law enforcement and for which it is ultimately responsible. The NYPD is a duly authorized public authority able to perform all functions of a police department under the applicable

sections of the New York State Criminal Procedure Law. Defendant assumes the risks incidental to the maintenance of the NYPD's police force and the employment of police officers.

## JURY DEMAND

18.    Plaintiffs demand a trial by jury in this action.

## FACTUAL BACKGROUND

19.    The NYPD operates a massive, integrated surveillance platform known as the DAS.

20.    DAS radically intrudes on New Yorkers' reasonable expectation privacy in the whole of their physical movements, associations, and expressive activities.

### *The DAS Persistently Records New Yorkers' Movements*

21.    Created in 2008 and expanded in the years since,[2] the DAS consolidates under one centralized network a wide range of surveillance technologies that before could only exist separately. The DAS continuously collects, stores, and analyzes information about New Yorkers every day. It does so automatically, without individualized suspicion, without judicial authorization, and without human input.

22.    The DAS brings together: (1) video cameras, including body-worn, handheld, dashboard, stationary, and aerial; (2) tracking tools, such as automated license plate readers ("ALPRs"), location trackers, and gunshot detectors; (3) biometric data, including from DNA collection, and fingerprint and iris scanners; (4) electronic monitoring devices, such as phone taps, X-ray imaging, digital record aggregation, and cryptocurrency analysis; and (5) social media surveillance, obtained by monitoring individuals' internet activity, scraping and storing

---

[2]    E. S. Levine, Jessica Tisch, Anthony Tasso & Michael Joy, *The New York City Police Department's Domain Awareness System*, 47 Informs 70 (Jan. 18, 2017), http://dx.doi.org/10.1287/inte.2016.0860.

online posts, and using social network analysis to map out a person's relationships, religious beliefs, and political affiliations, among other things.[3]

23.     By design, the DAS consolidates these distinct sources into a single, searchable application,[4] giving the NYPD the ability to track individuals across space and time.

24.     The camera network alone is so extensive that it captures nearly every New Yorker as they go about daily life—commuting, going to church, visiting a doctor, attending a protest, or buying groceries.[5] At last reporting, the DAS incorporates over 80,000 surveillance cameras city-wide.[6] And even when an individual is not recorded directly, the DAS infers their location through connected sensors and databases, linking it to biometric and identifying information. It delivers real-time, persistent tracking across the five boroughs.

25.     One feature that distinguishes the DAS from traditional investigative methods, in addition to the massive scope of the data it collects, is its use of powerful analytics. Facial recognition software, correlation engines, and the use of artificial intelligence ("AI") allow the NYPD to draw information at a scale unimaginable at the country's founding. Officers can, on information and belief, automatically track an individual across the city using computer vision software, which follows a person from one camera to the next based on descriptors as simple as

---

[3]     INFORMS, *Presentation: The New York City Police Department's Domain Awareness System*, YouTube (Feb. 1, 2017) (timestamp 0:57), https://www.youtube.com/watch?v=dOwu4SMbVl4 (listing a non-exhaustive group of DAS technologies).

[4]     NYPD*, Portable Electronic Devices: Impact and Use Policy*, NYC.gov (Apr. 11, 2023), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/portable-electronic-devices-ped-nypd-impact-and-use-policy_4.11.23_final.pdf (describing that NYPD-issued smartphones contain a mobile version of DAS).

[5]     Levine et al., *supra* note 2 (discussing the search capabilities and in-house algorithms powering the DAS).

[6]     Office of the Mayor, *Transcript: Mayor Eric Adams Delivers Remarks at NYPD Security Briefing in Anticipation of High Holidays*, NYC.gov, News  (Oct. 02, 2024), https://www.nyc.gov/mayors-office/news/2024/10/transcript-mayor-eric-adams-delivers-remarks-nypd-security-briefing-anticipation-high.

the color of a piece of clothing. A process that once took days or weeks of manual review can now be done "with the snap of a finger," in the words of the Police Commissioner.

26.     This analytical power is not limited to cameras. ALPRs record the time and location of vehicles as they move through the city, compiling a detailed record of where drivers travel, how often, and at what times. Social media monitoring software scrapes and analyzes online posts, revealing networks of friends and associates. Other DAS databases index physical characteristics such as scars, tattoos, medical conditions, and even the way a person walks.

27.     The DAS gathers even more granular data on Black, Latino, Muslim, and immigrant residents, communities, and neighborhoods. While the DAS surveils all New Yorkers, non-White residents are even more likely to be monitored because facial recognition cameras and gunshot detectors are disproportionately located in non-White neighborhoods.

28.     Teenagers and young people of color are particularly vulnerable to heightened levels of DAS surveillance. NYPD social media monitoring analyzes and collects online activity from tens of thousands of young Black and Latino New Yorkers and funnels the data into a Criminal Group Database, known as the GANGS Database,[7] which is available to officers through the DAS. Young people may be entered into the database merely for living in certain neighborhoods, using a particular social media hashtag, or associating with certain classmates or family members. This database is comprised almost exclusively of people of color, placing Black and Latino youth at constant risk of harassment, arrest, detention, and worse.

---

[7]     Press Release, NYC Dep't of Investigation, Release No. 16-2023, *DOI's Office of the Inspector General for the NYPD Issues Report Examining NYPD's Use and Operation of the Criminal Group Database* (Apr. 18, 2023), https://www.nyc.gov/assets/doi/reports/pdf/2023/16CGDRpt.Release04.18.2023.pdf (report stating that all 33,763 uniformed NYPD officers have access via the Enterprise Case Management System's DAS search function to the GANGS Database, searchable by name).

29.     All of this culminates in a staggering repository of information on New Yorkers of every background, yet the City imposes no known limits on how long it is retained or how it may be used—whether today or in years to come. It includes billions of license plate readings spanning at least five years, thirty days of closed-circuit television footage or CCTV,[8] records from gunshot detection microphones, tens of millions of 911 calls and 311 civilian complaints, arrest reports, parole and probation files, and state criminal records.[9] Additional databases maintained by other City agencies or private companies are also made available to the NYPD and folded into the DAS without limit.[10]

30.     Each of the NYPD's approximately 36,000 uniformed officers have access to the DAS.

31.     NYPD officers have access to the DAS through their workstations.[11]

32.     NYPD officers have access to the DAS on their mobile phones.[12]

---

[8]     NYPD, *Domain Awareness System (DAS): Impact and Use Policy*, NYC.gov (Apr. 11, 2021), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/domain-awareness-system-das-nypd-impact-and-use-policy_4.9.21_final.pdf (detailing that "the NYPD utilizes Closed Circuit Television (CCTV) cameras throughout the five (5) boroughs … DAS behaves as a centralized repository through which authorized users can access CCTV cameras … NYPD Detectives, Sergeants, and higher ranked members can use DAS to view live feed from CCTV cameras").

[9]     *Id.* (generally describing the capabilities of the DAS); *see also* Levine et al., *supra* note 2.

[10]     *City Council, Committee on Public Safety: NYPD Data Purchasing Practices from Private Companies*, City Meetings NYC (Feb. 19, 2025), https://citymeetings.nyc/meetings/new-york-city-council/2025-02-19-1000-am-committee-on-public-safety/chapter/nypds-data-purchasing-practices-from-private-companies/.

[11]     *Domain Awareness System (DAS): Impact and Use Policy*, *supra* note 8 ("DAS efficiently centralizes vital information that would otherwise be kept throughout different isolated data compartments within NYPD computer systems.").

[12]     *Portable Electronic Devices: Impact and Use Policy*, *supra* note 4 ("NYPD-issued PEDs contain a mobile version of the Domain Awareness System (DAS).").

33.     With a few taps, an officer can retrieve years of location data, view live camera feeds, pull arrest or complaint histories, and survey a person's social or political associations. This access is not limited to investigators or specialized units; it is distributed department-wide, without meaningful restrictions on scope or purpose. In practice, the application transforms every patrol officer into a mobile intelligence unit, capable of conducting warrantless surveillance at will. The ease and range of access magnify the risks of misuse, removing natural barriers that once constrained surveillance and enabling the constant monitoring of New Yorkers.

34.     Reports suggest that the DAS is commonly used in investigations,[13] yet there is no record of any officer ever being disciplined for unauthorized access. Nor is there evidence of a binding policy designed to restrict or monitor its use.[14] With no oversight, officers enjoy broad discretion to search the DAS for purposes that may be departmental as well as personal.

---

[13]     Mayor Eric Adams repeatedly affirms the DAS's centrality to the department's daily police work, and he appointed Police Commissioner Jessica Tisch based in large part on her leadership in developing the DAS. Press Release, New York City Press Office, *Mayor Adams Appoints Jessica Tisch as NYPD Commissioner*, NYC Office of the Mayor (Nov. 20, 2024), https://www.nyc.gov/office-of-the-mayor/news/847-24/mayor-adams-appoints-jessica-tisch-nypd-commissioner#/0.

[14]     NYC Comptroller*, Audit Report on the Information System Controls of the Domain Awareness System Administered by the New York City Police Department*, Office of the NYC Comptroller (June 26, 2015), https://comptroller.nyc.gov/reports/audit-report-on-the-information-system-controls-of-the-domain-awareness-system-administered-by-the-new-york-city-police-department/ (finding that the NYPD had "no adequate standard criteria to review DAS user activities" and further noting that "we found that there were individuals who were no longer NYPD employees whose DAS access had not been deactivated in the system").

35.     The NYPD has justified the DAS by pointing to crime prevention.[15] But years of evidence show that surveillance on this scale has not reduced crime.[16] And the department has conceded that some of its most expansive programs did not produce any credible leads.

36.     For all its reach into the lives of New Yorkers, the DAS offers intrusion without benefit.

### The Aggregation of Technologies Within the DAS Reveals Constitutionally Protected Activity Unknowable from Any One Source

37.     Many DAS components—facial recognition, ALPRs, social media monitoring—would raise serious constitutional concerns even if only used in isolation. In combination, however, they produce an intolerably invasive system. Aggregated data enables the NYPD to uncover constitutionally protected activity such as political expression, religious practice, or private association that would be unknowable from any single source. This aggregation magnifies the constitutional injury, creating violations far greater than the sum of the parts. For example, DAS enables the NYPD to retrospectively retrace a person's whereabouts, monitor their activity inside and outside the home, and predict future activities in a way that pole cameras or live human surveillance on their own cannot.

38.     The unprecedented reach of the DAS is best understood by examining the categories of information it collects and fuses together.

---

[15]     Levine et al., *supra* note 2. (quoting former Police Commissioner William J. Bratton saying, "the DAS is essential in keeping New York City safe from crime and terrorism").

[16]     *Historical New York City Crime Data*, NYC.gov: New York City Police Department, NYPD Stats (last visited Sept. 22, 2025), https://www.nyc.gov/site/nypd/stats/crime-statistics/historical.page (showing an increase in city-wide felonies since 2012).

39.     *First*, the system integrates various networks of cameras (*i.e.*, body cameras worn by police officers, handheld and dashboard cameras used in the field, stationary cameras fixed to poles and buildings, and aerial cameras mounted on drones or helicopters).

40.     *Second*, the DAS incorporates tracking technologies, such as ALPRs, location sensors, and gunshot detectors that record the presence and movement of people and vehicles throughout the city.

41.     *Third*, the NYPD adds biometric identifiers, including DNA samples, fingerprints, and iris scans, to match surveillance records to named individuals.

42.     *Fourth*, the DAS uses electronic monitoring systems that include phone taps capable of intercepting calls, X-ray imaging devices that scan vehicles and containers, programs that aggregate digital records from multiple databases, and software that tracks financial transactions.

43.     *Fifth*, the DAS collects information from the internet. It monitors online activity, gathers and stores posts from social media platforms, and uses software to study how people are connected to one another online. These tools give the NYPD access to records of what people say and share online, as well as the friends and associations they maintain. In the paragraphs that follow, Plaintiffs describe how the Defendant operationalizes each of these categories, and how their combined use forms a surveillance apparatus far more invasive than each tool on its own.

*Video Camera Technologies*

44.     The DAS camera network, as explained, combines footage from many different types of cameras. These include body-worn cameras carried by officers, handheld cameras used in the field, dashboard cameras mounted in police vehicles, stationary cameras fixed to poles and buildings, and aerial cameras attached to drones and helicopters.

45.     The NYPD operates tens of thousands of stationary cameras across the city. These devices can pan, tilt and zoom, and capture both wide areas and fine details in high resolution. In most neighborhoods, camera coverage is so dense that residents cannot travel to work, school, or places of worship without being recorded. In some neighborhoods, particularly communities of color, coverage is so dense that residents cannot walk from the street to their front door without being captured by multiple cameras from different angles.

46.     The NYPD also partners with the Metropolitan Transportation Authority ("MTA") to incorporate cameras in the subway system into DAS, with over 5,100 cameras feeding live footage into DAS as of April 2022.[17] The MTA has also begun integrating AI video analytics that analyze video feeds in real time from cameras installed on subway cars and buses, using computer vision to enable "predictive prevention"[18] of crime on subway platforms.[19]

47.     The DAS further incorporates footage from tens of thousands of privately operated cameras. These include cameras maintained by businesses and other public and private institutions.[20] Unlike NYPD-owned cameras, which must be labeled, these private devices provide no public notice of their connection to the system. The department has not disclosed the full number of privately owned cameras integrated into the DAS.

---

[17]     John Miller, *NYPD Statement on MTA Cameras*, NYC.gov, NYPD Media (Apr. 14, 2022), https://www.nyc.gov/site/nypd/news/sa0005/nypd-on-mta-cameras.

[18]     Michael Kemper, Chief Security Officer, Metropolitan Transportation Authority, *MTA Board – Safety Committee Meeting – 4/28/2025*, YouTube, 30:41 (Feb. 10, 2026), https://www.youtube.com/live/I3GHFtRn97E?t=1839s.

[19]     *Request for Information (RFI) No. 0000532398, AI Video Analytics for Forbidden Objects Unattended Items, Unsafe Behaviors*, Metropolitan Transportation Authority (Dec. 5, 2025), https://www.mta.info/document/193416.

[20]     *Domain Awareness System (DAS): Impact and Use Policy*, *supra* note 8 (describing "external stakeholders providing NYPD with access to their public-space facing cameras").

48.    In addition, cameras operated by other City agencies have been connected to the DAS. For example, NYCHA is integrating its more than 20,000 cameras into the system. A NYPD's spokesperson recently testified that the department planned to incorporate 1,900 cameras across 19 NYCHA properties into DAS by the end of 2025, and an additional 17,897 cameras across 119 NYCHA properties in the program's next phase. The over 500,000 New Yorkers living in NYCHA housing may be subjected to even further heightened surveillance merely because the NYPD designates part of a housing complex—or all of it—as a "criminal group" in its GANGS database.

49.    Aerial cameras expand the system further. Video captured by drones and helicopters is added into the DAS, allowing the department to monitor activity from above across entire blocks and neighborhoods.

50.    Since 2018, the NYPD has deployed drones with growing frequency at public celebrations, social gatherings, and protests.[21] These drones capture high-resolution video, use thermal sensors, and record audio.[22] By 2024, the City had authorized the use of autonomous drones in response to 911 calls, gunshot alerts, and "crimes in progress as needed,"[23] with further expansions announced for 2025.[24]

---

[21]    *UAS (Drones) Reports & Analysis*, NYC.gov: New York City Police Department, NYPD Stats (last visited Sept. 22, 2025), https://www.nyc.gov/site/nypd/stats/reports-analysis/uas-drones.page.

[22]    Press Release, New York City Press Office, *Mayor Adams, Interim Police Commissioner Donlon Announce "Drone as First Responder" Program to Reduce Response Times and Keep New Yorkers Safe*, NYC Mayor's Office (Nov. 13, 2024), https://www.nyc.gov/office-of-the-mayor/news/827-24/mayor-adams-interim-police-commissioner-donlon-drone-first-responder-program-to#/0.

[23]    Press Release, New York City Press Office, *Mayor Adams Announces New Drone Operations Committee*, NYC Mayor's Office (Jul. 22, 2025), https://www.nyc.gov/mayors-office/news/2025/07/mayor-adams-announces-new-drone-operations-committee.

[24]    *Id.*

51.     New Yorkers—including individuals attending protests or residing in NYCHA housing—directly witness NYPD officers taking their photographs and recording them from their vehicles and mobile phones.

52.     Through the DAS interface, officers can view both archived recordings and live camera feeds. The system provides access to at least thirty days of stored footage, along with the ability to observe events as they unfold in real time.[25]

53.     NYPD officers also use camera feeds in the DAS to conduct facial recognition searches.[26] This allows comparison of an individual's face against recordings pulled from tens of thousands of feeds. Public reporting indicates that in recent years such searches have numbered in the tens of thousands annually.

54.     All these camera feeds—whether owned by the NYPD, contributed by private businesses, operated by other City agencies, or captured from the air—are accessible through the DAS without scrutiny.

*Tracking Technologies*

55.     The DAS also integrates a wide array of tracking technologies, including ALPRs, location sensors, and gunshot detection systems. These devices record the presence and movement of people and vehicles across New York City and feed that information directly into the centralized DAS platform.

---

[25]     NYPD, *Closed-Circuit Television (CCTV) Systems: Impact Use and Policy*, NYC.gov (Oct. 26, 2023), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/cctv-systems-nypd-Impact-and-use-policy_10.26.23.pdf.

[26]     *Domain Awareness System (DAS): Impact and Use Policy*, *supra* note 8 (describing DAS capabilities generally; specifying that still images the DAS collects "may be used as a probe image for facial recognition analysis").

56.     ALPRs photograph and record vehicles as they pass unmarked checkpoints throughout the city, including every entry point to the island of Manhattan. Each record includes the vehicle's license plate number, location, and time, as well as the make, model, and color of the vehicle. In many cases, the devices also capture images of drivers and passengers, including children and rideshare users.

57.     The most recent public disclosure of the NYPD's ALPR program occurred in 2014, when the department testified before the City Council that it operated approximately 500 such devices.[27] Since then, the program has expanded considerably. ALPR data is combined with other surveillance information in the DAS, allowing officers to reconstruct detailed records of individuals' routines and relationships.

58.     ALPR data is further supplemented by records obtained from private companies and out-of-state law enforcement partners. In 2015, the NYPD contracted with Vigilant Solutions, Inc., now a subsidiary of Motorola, to access its nationwide database of more than two billion license plate records. Vigilant Solutions adds over one million new records each day. Through Vigilant's platform, NYPD officers can use functions such as "stakeout," which identifies likely locations to find a vehicle based on past patterns; "associate analysis," which flags vehicles commonly seen together; and "predictive analysis," which attempts to forecast a person's future location based on past travel routines. The NYPD holds on to the license plate data for at least five years regardless of whether a car triggers any suspicion.[28]

---

[27]     John J. Miller, Deputy Comm'r of Intelligence & Counterterrorism, N.Y.C. Police Dep't, *Testimony Before the N.Y.C. Council Committees on Public Safety and Fire and Criminal Justice Services*, NYCLU (Nov. 12, 2014), https://assets.nyclu.org/DC_Miller_Testimony.pdf.

[28]     NYPD, *License Plate Readers: Impact and Use Policy*, NYC.gov (Apr. 11, 2021), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/license-plate-readers-lpr-nypd-impact-and-use-policy_4.9.21_final.pdf.

59.     The DAS also incorporates other tracking devices. Location sensors are deployed to record patterns of movement across the city, while gunshot detection systems log and transmit the location of possible shootings in real time. These data streams are integrated alongside ALPR data to expand the department's ability to record movements and relate them to individuals.

60.     Since 2015, the NYPD has invested in ShotSpotter, a gunshot detection system that relies on acoustic sensors to classify loud noises as potential gunfire.[29] These sensors operate continuously, twenty-four hours a day, and are sensitive enough to record conversations of people nearby, sometimes even inside their homes.[30] When triggered, ShotSpotter triangulates a location and alerts officers through the DAS.[31] According to City records, Defendant has spent more than $45 million to install and maintain these microphones, which now cover wide areas of the city.[32] ShotSpotter data—including audio clips, timestamps, and location information—is stored within the DAS.[33]

61.     ShotSpotter's accuracy has been repeatedly questioned. The City Comptroller reported that up to 84 percent of alerts may be false alarms, and more than 99 percent of

---

[29]     *See* NYPD, *ShotSpotter: Impact and Use Policy*, NYC.gov (Apr. 11, 2021), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/shotspotter-nypd-impact-and-use-policy_4.9.21_final.pdf (describing NYPD's gunfire-detection acoustic sensors, access to confirmed gunfire event data via the DAS, limitations on sensor audio capture, data retention, and roles of authorized users).

[30]     *Id.*

[31]     *Domain Awareness System (DAS): Impact and Use Policy*, *supra* note 8 (describing that ShotSpotter is integrated into the DAS so that when a gunshot detection microphone captures a sound event, the confirmed gunfire alert data is relayed into the DAS for use by authorized users).

[32]     NYC Comptroller, *Audit Report on the New York City Police Department's Oversight of Its Agreement with ShotSpotter Inc. for the Gunshot Detection and Location System*, Office of the NYC Comptroller (June 20, 2024), https://comptroller.nyc.gov/reports/audit-report-on-the-new-york-city-police-departments-oversight-of-its-agreement-with-shotspotter-inc-for-the-gunshot-detection-and-location-system/ (reporting that NYPD had spent $45.4 million on ShotSpotter from August 14, 2014 through June 30, 2023).

[33]     *ShotSpotter: Impact and Use Policy*, *supra* note 30.

responses fail to recover a firearm or identify a suspect.[34] Other jurisdictions, including Chicago and Seattle, have abandoned ShotSpotter because of these shortcomings. Yet the NYPD continues to invest in the technology, adding vast streams of sensitive audio to the DAS, even as its efficacy in reducing crime remains unproven.

*Biometric Technologies*

62.     The DAS incorporates biometric identifiers that tie surveillance data directly to individuals. These include DNA samples collected by the NYPD, fingerprint records drawn from both criminal and civil sources, and iris scans.

63.     The NYPD—in partnership with the Office of the Chief Medical Examiner— maintains one of the largest DNA databases in the country, with more than 100,000 profiles, many collected from individuals never convicted of a crime. These records are integrated into the DAS, allowing officers to link genetic material to other surveillance entries.

64.     In addition, fingerprint databases maintained by the Office of Criminal Justice and the NYPD are accessible through the system. These records connect individuals to arrests, summonses, and other official contacts.

65.     The department has also introduced iris scanning used as part of its identification practices.[35] Iris scans, like fingerprints and DNA, provide a permanent and unique marker of identity, and their integration into the DAS allows for cross-referencing against other surveillance streams.

---

[34]     NYC Comptroller, *supra* note 28 (finding that NYPD responded to thousands of ShotSpotter alerts, but only 8-20% of alerts sampled during 2022-2023 were confirmed as shootings; NYPD spent over 426.9 hours in June 2023 alone investigating alerts that did not result in confirmed shootings).

[35]     NYPD, *Iris Recognition: Impact and Use Policy*, NYC.gov (Apr. 11, 2021), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/iris-recognition-nypd-impact-and-use-policy_4.9.21_final.pdf.

66.     To expand its biometric surveillance capabilities, the City has spent millions of dollars on new technologies and databases. The NYPD's Photo Imaging System, which includes facial recognition capabilities, had cost upwards of five million dollars as of 2020, with an estimated total maintenance cost of over $100,000 per year. Also as of 2020, the Photo Imaging System already included approximately 14.5 million arrest photos against which NYPD officers can compare stills taken from CCTV footage, or images scraped from social media.

67.     Some biometric records enter the DAS not through criminal investigations but through everyday dealings with City agencies—for example, when residents apply for services, permits, or benefits.[36]

68.     Individuals are not informed that this information may be added into a policing database.

69.     In this way, data collected for ordinary civic purposes is converted into a tool of criminal surveillance, even for those never suspected of wrongdoing.

*Electronic Monitoring Technologies*

70.     The NYPD employs electronic monitoring through the DAS using tools such as phone taps that intercept and record calls; X-ray imaging devices that scan vehicles, packages, and containers; programs that pull together digital records from multiple City and law enforcement databases; and software that traces transactions across financial networks.

---

[36]     *E.g.*, Driver's license photos collected for everyday identification purposes are accessible to law-enforcement facial-recognition searches without notice to the individuals involved, and New York agencies have shared DMV records with NYPD for investigations. NYPD also describes the DAS as a central hub that aggregates multiple databases and allows officers to extract images for facial-recognition comparison. *See* Levine et al., *supra* note 2 (describing the DAS as a network of "sensors, databases, devices, software, and infrastructure that delivers tailored information and analytics to mobile devices and precinct desktops").

71.    Through the DAS, the department can intercept and record phone calls. These recordings are not limited to the fact that a call occurred; they can capture the content of conversations and the identities of those on the line. This allows the NYPD to move well beyond identifying the fact of a call and into the content, context, and associations that the call reveals. DAS also tracks the past history of call locations.

72.    X-ray imaging devices add another layer of monitoring. These scanners, deployed at bridges, tunnels, and other checkpoints, can penetrate vehicles and cargo containers to reveal their contents without physical entry.[37] Data from these scans, when integrated into the DAS, provides the NYPD with a rolling catalog of private property and movements that would otherwise be beyond government scrutiny.[38]

73.    Digital record aggregation further broadens the reach of the DAS. Programs pull together information from multiple databases maintained by City agencies and law enforcement partners, ranging from administrative records to enforcement histories.[39]

74.    The DAS also incorporates financial and cryptocurrency analysis software. According to NYPD disclosures, the department has invested in banking and blockchain forensics tools that allow investigators to trace money across centralized and decentralized networks.[40] With these tools, the department can examine public banking and blockchain records

---

[37]    NYPD, *Mobile X-Ray Technology: Impact and Use Policy*, NYC.gov (Apr. 11, 2021), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/mobile-x-ray-technology-nypd-impact-and-use-policy_4.9.21_final.pdf.

[38]    *Id.*

[39]    *Domain Awareness System (DAS): Impact and Use Policy*, *supra* note 8.

[40]    NYPD, *Cryptocurrency Analysis Tools: Impact and Use Policy*, NYC.gov (Apr. 11, 2021), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/cryptocurrency-analysis-tools-nypd-Impact-and-use-policy_4.9.21_final.pdf.

(as well as internet payment platforms like PayPal, Venmo, and Cash App) for information tied to financial transactions, follow the movements of funds, and identify the individuals tied to that banking activity.[41]

75.     The DAS also surveils NYCHA residents' online activity under the guise of "free" broadband provided by the City.

*Social Media Surveillance*

76.     Finally, the DAS surveils the online activities and speech of New Yorkers. The system collects and stores information from social media platforms, including Facebook, Instagram, Twitter, and TikTok. Posts, photographs, and messages are scraped in bulk, together with identifying details (*e.g.*, timestamps, geolocation tags, and network connections) about the individuals that publish them, preserving a record of that person's entire social media page.

77.     NYPD officers flag protected First Amendment activity, including speech related to protests, posted on social media. The NYPD uses social media monitoring tools developed by private companies to map social networks and conduct widespread warrantless surveillance of New Yorkers' online activities. The resulting intelligence reports catalog New Yorkers' "anti-police and anti-Trump" posts, use of the hashtag #nypdsucks, and posts about the Black Lives Matter movement.

78.     NYPD officers also employ undercover methods online. Officers create and operate fake social media accounts to impersonate peers, join messaging groups, and interact with individuals for the purpose of gathering intelligence.

79.     Information gathered through these methods is integrated into the broader DAS. A photograph shared online can be matched with a facial recognition hit from a surveillance

---

[41]     *Id.*

camera; an image captured at a protest can be run through facial recognition systems to identify a protestor, and then compared to social media posts to confirm a match; a post about attending a gathering may be linked to license plate reader data showing travel to that location. In this way, online activity is fused with physical tracking systems to create a more comprehensive record of a person's life. These files may then be kept for years or even indefinitely, tracking New Yorkers' protest activity over time.

80.    To manage this enormous volume of data, the NYPD relies on analytics tools that employ machine learning and artificial intelligence.[42] These tools are used to detect patterns and to track individuals across the many different data streams captured in the DAS.[43] Automated systems scan millions of entries for specified individuals, objects, or behaviors. One example mentioned above is that a person can be followed across multiple videos based on something as simple as the color of their clothing. Patternizr, another DAS tool, processes thousands of reports to identify purported similarities among alleged crimes—connections that no officer could manually detect.

81.    Through this integration of technologies and advanced analytics, the DAS turns New Yorkers' lives into permanent, searchable dossiers. Their movements can be reconstructed, cross-referenced with other datasets, and used to monitor activity that is constitutionally protected. This AI-supercharged surveillance platform effortlessly generates detailed portraits of every New Yorker. And because the City has imposed no definite restrictions on either the duration or the use of the DAS, every New Yorker is forced to live with the reality that their

---

[42]    *Compare Domain Awareness System (DAS): Impact & Use Policy*, *supra* note 8, at 10 (stating that the DAS "does not use video analytics") *with* Levine et al., *supra* n.2 (stating that the DAS deploys automated pattern recognition, machine learning, and data visualization, and that analytic methods are "built into the DAS software").

[43]    *Id.*

government is recording exacting portraits of their lives, which may be probed at will without their consent or judicial oversight. Nor can they know what new technologies will emerge to boost this surveillance in the years ahead.

### *The DAS Continues to Expand Its Reach and Surveillance Capabilities*

82.     Despite declines in most major crime categories in 2025, the NYPD continues to expand the DAS, subjecting New Yorkers to ever more expansive surveillance without evidence of any corresponding impact on public safety. In Commissioner Tisch's February 2026 State of the NYPD address, she introduced "DAS 2.0 for Real-Time Policing."

83.     The NYPD asserts that DAS 2.0 will "bring[] real-time awareness directly into the field."[44] While Commissioner Tisch claims that such a system "is not an automated tool to track people's movements throughout the city,"[45] she also stated that DAS 2.0 would provide officers with real-time knowledge of cars passing nearby ALPRs and access to live drone video.[46] The DAS is already a vast surveillance apparatus allowing NYPD officers to track New Yorkers' movements, associational activity, and even DNA. Further expansion of the DAS, especially to its real-time tracking capabilities, only worsens the constitutional injury.

84.     Although Commissioner Tisch asserted that DAS 2.0 "is not AI,"[47] the NYPD's IUP released one week before her speech made no representation that the DAS refrained from using artificial intelligence or machine learning. To the contrary, that policy explicitly removed

---

[44]     Fox 5 New York, *Full: Tisch delivers 2026 State of the NYPD address*, YouTube, 18:50 (Feb. 10, 2026), https://www.youtube.com/watch?v=o512Yt8XMO4.

[45]     *Id.* at 19:15.

[46]     *Id.* at 18:53.

[47]     *Id*. at 19:10.

any "statement that the Domain Awareness System does not use artificial intelligence and machine learning" after public comments highlighted the inaccuracy of that statement.[48]

85.    The announcement of DAS 2.0 has coincided with reduced transparency around the system's data retention policies. In the NYPD's newest batch of updated Public Oversight of Surveillance Technology ("POST") Act disclosures, the department removed references to the duration for which records are stored within the DAS ecosystem. The NYPD's new DAS Impact and Use Policy ("IUP") states that records are retained and disposed of according to a schedule approved by the New York City Law Department and Department of Records and Information Services[49]—but does not disclose the schedule itself, leaving New Yorkers with no way to know how long the City stores their data.

***The NYPD Uses the DAS to Share New Yorkers' Data with Local, State, and Federal Agencies***

86.    The NYPD shares the personal information of New Yorkers collected through the DAS with outside entities. Data drawn from cameras, ALPRs, biometric identifiers, social media, and other sources is shared with other City agencies, State law enforcement, and the federal government. This sharing occurs without notice to the individuals whose data is involved and without their consent.

87.    One way the department shares information from the DAS is through its participation in joint task forces. NYPD officers regularly work alongside local agencies and federal partners, including investigators from the Department of Homeland Security ("DHS").[50]

---

[48]    *Domain Awareness System: (DAS): Impact and Use Policy*, *supra* note 8.

[49]    *Id.*

[50]    *See, e.g.,* Press Release, NYC Press Office, *Mayor Adams on Homeland Security Operation NYC Last Night*, NYC Office of the Mayor (Jan. 28, 2025), https://www.nyc.gov/mayors-office/news/2025/01/mayor-adams-on-homeland-security-operation-nyc-last-night?utm; Robert Griffin, *Working with NYPD and First-Responder*

In these settings, officers can bring DAS data into the investigation and transmit it to their counterparts. Once that information enters federal control, the NYPD has acknowledged that it loses control over how the recipients may use it.[51]

88.     ALPR databases aggregated by NYPD likewise appear vulnerable to federal access. Recent disclosures have revealed that ALPR data has been shared in joint investigations with other law enforcement agents. By the NYPD's own account,[52] these records move across state lines, placing New Yorkers under surveillance by agencies far removed from this jurisdiction.

89.     Public oversight and City Council hearings have raised concerns that those external uses may include civil immigration enforcement or political surveillance, despite City law prohibiting the use of local resources for such purposes.[53] Those concerns were confirmed in

---

*Partners to Keep Our Cities Safe*, U.S. Dep't. of Homeland Sec'y (Nov. 24, 2015), https://www.dhs.gov/archive/news/2015/11/24/working-nypd-and-first-responder-partners-keep-our-cities-safe?utm; Press Release, DHS S&T, *S&T Works with NYPD to Test Communication Systems*, U.S. Dep't. of Homeland Sec'y (Aug. 1, 2017), https://www.dhs.gov/archive/science-and-technology/news/2017/08/01/st-works-nypd-test-communication-systems?utm.

[51]     *See City Council, Committee on Public Safety: Information Sharing Between NYPD and Federal Law Enforcement Partners*, City Meetings NYC (Feb. 19, 2025), https://citymeetings.nyc/meetings/new-york-city-council/2025-02-19-1000-am-committee-on-public-safety/chapter/information-sharing-between-nypd-and-federal-law-enforcement-partners/ (Gerber testimony, 1:29:50–1:30:22) (stating that "if we're working on a joint investigation [with federal or state partners], typically we part . . . as part of a task force, we're gonna[sic] share whatever is relevant to that criminal investigation," and that the department in effect "loses control" over how shared data may be used).

[52]     *City Council, Committee on Public Safety: Control over NYPD Data Once Shared with Task Forces*, City Meetings NYC (Feb. 19, 2025), https://citymeetings.nyc/meetings/new-york-city-council/2025-02-19-1000-am-committee-on-public-safety/chapter/control-over-nypd-data-once-shared-with-task-forces/ (statement of Deputy Comm'r Gerber at 1:34:41–1:34:50) ("we cannot dictate to federal agencies what they can or can't do as part of their federal investigations," acknowledging that once data is shared with a task force, the NYPD "cannot control how task forces or other entities use the shared data" and whether they decide to pass the data to "other entities").

[53]     *City Council, Committee on Public Safety: NYPD's Data Sharing Practices With Other Law Enforcement Agencies*, City Meetings NYC (Feb. 19, 2025), https://citymeetings.nyc/meetings/new-york-city-council/2025-02-19-1000-am-committee-on-public-safety/chapter/nypds-data-sharing-practices-with-other-law-enforcement-

May 2025, when reports revealed that the NYPD transmitted personal information about a protester—including a sealed arrest record—to U.S. Immigration and Customs Enforcement ("ICE"). The department later admitted to the disclosure; and it was not an isolated incident. In March 2025, DHS revoked a student's visa based on two NYPD summonses she had received during a protest the previous year – both of which had been sealed and should have not been available to DHS – leading to her arrest and prolonged detention.

90.     Indeed, Commissioner Tisch has stated that "NYPD detectives work[] seamlessly with federal agencies on a daily basis."[54] There is no formalized system across task forces for how requests for information from federal agencies are made, and the NYPD does not track these requests—leaving New Yorkers in the dark as to how this data is shared, to whom, and for what purpose.

91.     These are not the only instances of local agency coordination with federal immigration enforcement: ICE has also collected license plate data from New York, despite laws in place limiting law enforcement cooperation with immigration agencies, and the Department of Corrections transferred a person into ICE custody without a judicial warrant. These episodes show how New Yorkers' personal data, once captured by the DAS, can escape protections under local law and be used for purposes wholly unrelated to its original collection.

---

agencies/ (testimony of Deputy Commissioner Michael Gerber) (describing NYPD's information-sharing with ICE, FBI, and other federal and local agencies).

[54]     Jessica Tisch, *NYPD's stance on immigration enforcement and federal partnerships,* City Meetings NYC, 0:26:4 (May 29, 2025) https://citymeetings.nyc/meetings/new-york-city-council/2025-05-29-1000-am-committee-on-public-safety/chapter/nypds-stance-on-immigration-enforcement-and-federal-partnerships/

92.     The department's partnerships with private entities expand this information flow still further. Programs such as NYPD SHIELD[55] and the Lower Manhattan Security Initiative[56] were designed to collect data from private-sector feeds. These same channels allow outward sharing of information, meaning data first aggregated into the DAS can ultimately move into the hands of non-NYPD recipients, including private parties.

93.     These practices develop amidst a broader federal effort to consolidate and exploit Americans' personal data. Under the Department of Government Efficiency ("DOGE") and in partnership with private contractors such as Palantir, the federal government has begun combining records from various agencies like the Internal Revenue Service, the Social Security Administration, and the Department of Veterans Affairs. This trend has profound consequences for New Yorkers. Once the NYPD transmits DAS surveillance to federal partners, it can be combined with these other federal repositories and repurposed for prosecutions far beyond the borders of New York. Already, doctors in the city have been threatened with out-of-state prosecutions for providing reproductive care that is legal in this State but criminalized elsewhere. The NYPD's decision to share its residents' personal information with federal authorities exposes New Yorkers to precisely these harms.

---

[55]     NYPD SHIELD, *About*, https://www.nypdshield.org/about/ (last visited Sept. 25, 2025) (describing NYPD SHIELD as a public–private partnership through which the department collaborates with private sector security personnel, emphasizing a "two-way street" of information flow in which the department shares intelligence and alerts while private sector participants provide situational reporting).

[56]     NYPD, *Counterterrorism Bureau*, NYC.gov (last visited Sept. 25, 2025), https://www.nyc.gov/site/nypd/bureaus/investigative/counterterrorism.page; NYPD SHIELD, *Lower Manhattan Security Initiative* (describing establishment of a network of 3,000 public and private surveillance cameras to monitor vehicles and pedestrians); *NYCLU v. New York City Police Department (Seeking access to information on Lower Manhattan Security Initiative under FOIL)*, NYCLU (Sep. 17, 2008), https://www.nyclu.org/court-cases/nyclu-v-new-york-city-police-department-seeking-access-information-lower-manhattan-security (last visited Sept. 25, 2025) (litigation seeking disclosure of records concerning the scope of the Initiative).

94.     The DAS operates not only as a local surveillance platform but as a conduit to larger systems of national intelligence and law enforcement. Once data leaves the NYPD's hands, there is no practical means of knowing where it travels, how long it is retained, or how it may be used. For New Yorkers, information first captured on a city street can resurface in the files of federal officers, distant prosecutors, or agencies with no connection to the community where it was collected.

### By Operating the DAS, the City Violates the Rights of New Yorkers

95.     The existence and operation of the DAS is changing how New Yorkers live their lives. When people's locations, associations, and activities are continuously tracked, they change their behaviors. Some may choose different routes to work or school to avoid dense clusters of cameras. Others may alter the times they travel or even forego public transportation to limit exposure to license plate readers or surveillance in the subway system. Like the Named Plaintiffs here, New Yorkers begin to live not with freedom of movement, but with the calculation of how to avoid being watched.

96.     As a result, the DAS is forcing New Yorkers to rethink how they interact with one another. People who once gathered freely with family, friends, and colleagues in public— whether at restaurants, parks, houses of worship, or community centers—now hesitate or change their plans, aware that their movements are recorded, logged, and preserved.

97.     One example is the impact on religious communities. Faith leaders have curtailed their activities out of fear of surveillance. Faith communities have reduced services, stepped back from public advocacy, or limited attendance at religious gatherings to avoid drawing the attention of law enforcement. Congregants, in turn, refrain from seeking counsel or participating

fully in worship, chilled by the possibility that their presence could be recorded, retained, and used against them.

98.    Artists, writers, students, workers, and advocacy organizations have also expressed hesitation to gather in groups or engage in public or online expression, from liking a social media post to engaging in community organizing. They change their behavior on social media by posting less frequently and censor the art they create to avoid scrutiny from law enforcement. They worry about being targeted, watched, or labeled by association. This has undermined their work and diminished the vibrancy of public life, curtailing the very freedoms of speech, expression, and association that New York City has long prided itself on protecting.

99.    The same fear deters New Yorkers from seeking critical medical care, social services, or community support. People who need to visit health clinics, counseling centers, shelters, or legal aid offices hesitate, aware that their presence at and commutes to such locations are tracked and retained by the DAS. Others avoid approaching service providers altogether, fearing that their private needs could become known to third parties or used against them.

100.    The result is a climate of fear and self-censorship. New Yorkers are altering their conduct and constraining their associations to avoid the gaze of the DAS. Plaintiffs in this case have experienced this chilling effect firsthand.

### *The Polices Set Forth Above Are the Policies of the City of New York*

101.    The City of New York and its police department developed and maintained formal (written) and de facto (unwritten) interrelated policies, widespread informal practices, and/or customs, which are set forth above.

102.    The City, by its agencies and officials, deprived Plaintiffs and the Class of their constitutional and statutory rights as a matter of official municipal policy and/or informal custom so pervasive and widespread as to practically have the force of law.

103.    Defendant's policies and widespread practices regarding the DAS are not the least restrictive means of accomplishing any compelling governmental purpose.

104.    Defendant subjects the Plaintiffs and the Class to infringements on their rights to privacy, free speech, expression, and association—causing New Yorkers to change their behaviors—and officials with final policymaking authority have intended these effects to occur.

105.    Defendant's policies and widespread practices subject Plaintiffs and the Class to surveillance on the basis of characteristics beyond their control, including without limitation, their perceived racial and/or ethnic identity, where they grew up, their family, and their neighborhood ties. Named Plaintiffs and the Class cannot simply alter their behavior to avoid future violations of their constitutional and civil rights at the hands of the NYPD. Moreover, DAS surveillance is so pervasive that it is virtually impossible to avoid.

106.    Unless restrained by order of this Court, a real and immediate threat exists that the rights of Plaintiffs and the Class will continue to be violated in the future by the NYPD's official policies and widespread practices.

### *Pamela Wridt and Robert Sauve*

107.    Plaintiffs Pamela Wridt and Robert Sauve are longtime residents of Brooklyn, New York. They share their home in Brooklyn, where they live together in the Bedford-Stuyvesant neighborhood. They are first-time homeowners, deeply rooted in their community, and engaged in civic, academic, and advocacy work.

108.    Ms. Wridt is a children's rights advocate and researcher. She has also engaged directly with the department regarding surveillance in her own neighborhood, including filing a civilian complaint and records request concerning the two NYPD-owned cameras installed outside her residence.

109.    Mr. Sauve is a professional radio disc jockey. He has been subjected to police surveillance and harassment since adolescence, beginning with stop-and-frisk encounters. Over the years, he has been photographed by NYPD officers at protests, followed and spotlighted by police helicopter, and faced persistent monitoring in his neighborhood. His history of negative encounters with the police makes his awareness of the NYPD's constant surveillance acutely distressing.

*Surveillance Throughout the City*

110.    Mr. Sauve and Ms. Wridt feel the reach of the DAS throughout the city. Ms. Wridt reports a pervasive awareness of cameras wherever she travels, whether by foot, rideshare, or subway. Mr. Sauve no longer attends protests, deterred by stifling NYPD surveillance, including aerial surveillance, cell phone monitoring, biometric and facial recognition technologies, and officers photographing participants—enabling them to compare those images against social media surveillance to confirm identities. Both Mr. Sauve and Ms. Wridt are aware that their activism and associations have placed them under heightened scrutiny, including warrantless surveillance, chilling their ability to exercise their rights freely.

111.    Mr. Sauve and Ms. Wridt are recorded by DAS cameras, trackers, scanners, and electronic monitoring technologies as they move about the city by foot, transit, and car, including rideshare and with friends. Multiple times per week, on every short ride from her home to the local YMCA, for example, Ms. Wridt observes at least two police cameras recording her

movements, in addition to the two cameras outside her home. Ms. Wridt also observes multiple NYPD cameras on her car rides from Brooklyn to Queens. One such camera points directly at a community center she frequents that is located inside a NYCHA complex. Notably, Ms. Wridt has not observed NYPD cameras pointing at the affluent homes only a few blocks away.

112.    Both have become aware of pervasive surveillance as they move throughout the city and their neighborhood, including additional NYPD cameras further down their street, and a gunshot detector close to their home.

113.    Mr. Sauve and Ms. Wridt have frequently observed police helicopters hovering over their neighborhood for long periods of time.

114.    Due to persistent surveillance, Mr. Sauve wears welding sunglasses when he leaves the home, making more difficult tasks as simple as taking out the trash. Mr. Sauve tries to minimize taking public transit to avoid surveillance. On such trips, he wears welding glasses and a mask that fully covers his face, leading to overheating, discomfort, and difficulty seeing.

115.    Although Mr. Sauve grew up in NYCHA housing, he no longer visits his old block or friends who live in NYCHA housing because of the intense surveillance there, alienating him from longtime community members.

*Surveillance Online*

116.    Ms. Wridt previously enjoyed using social media but deleted her content to minimize further surveillance online, which has hampered her ability to find work.

117.    Mr. Sauve uses social media to promote events as a DJ. He previously set his accounts private to avoid online surveillance, which stymied his ability to promote events. Mr. Sauve remains forced to choose between his livelihood and his mental and physical health,

which are harmed by his awareness of persistent online surveillance. He has curtailed his social media activity due to surveillance and fear of retaliation.

118.    Mr. Sauve and Ms. Wridt regularly make phone calls and use internet payment platforms that are known to be monitored by DAS, folding their private communications and transactions into the NYPD's vast repository of information about them.

*Surveillance at Home*

119.    They are also watched at home. Both Mr. Sauve and Ms. Wridt live under the constant gaze of DAS surveillance as the NYPD mounted a box with two cameras directly outside their home, aimed at their living room and bedroom windows, peering into the interior of their home. The cameras' recording of the intimate details of Mr. Sauve and Ms. Wridt's movements and activities inside their own home has transformed what should be their place of safety into a space of anxiety. They have covered their windows with foil to block the cameras' view, depriving themselves of sunlight, breeze, and the simple enjoyment of looking outside. They avoid spending time in their second-floor bedroom that faces the cameras. Mr. Sauve and Ms. Wridt have also observed drones flying over their back porch on multiple occasions. Ms. Wridt describes the omnipresent surveillance as a daily violation, one that has left her unable to feel at ease in and around her own home. Mr. Sauve and Ms. Wridt received no notice before the cameras were installed outside their home, and the worker who installed the cameras confirmed that they rotate 360 degrees.

120.    Mr. Sauve and Ms. Wridt have also lost the enjoyment and value of their home. Because of the constant surveillance, they no longer use their front yard, rent out their apartment unit, open their blinds, or open their windows widely for air. The presence of the cameras has diminished their property's worth and inflicted ongoing emotional distress. For Mr. Sauve, who

suffers from a chronic illness aggravated by stress, the constant surveillance has had serious health implications. The inability to feel comfortable in and around the home heightens his stress and anxiety, exacerbating his physical symptoms.

121.    Mr. Sauve and Ms. Wridt have expended significant resources trying to protect their privacy at home, including tinting their windows and planning costly renovations. Nonetheless, they can still see the cameras from inside their home, resulting in persistent psychological distress. The cameras remain visible from the backyard, with sightlines that penetrate through the living room and kitchen to the rear of the home.

122.    The DAS cameras have also eroded Ms. Wridt and Mr. Sauve's sense of community. Their front porch, once a vibrant hub for gatherings with neighbors, overnight became a space that Plaintiffs and their guests no longer feel comfortable or safe to enjoy. Ms. Wridt and Mr. Sauve object to the device disproportionately targeting Black and Brown children on their block, which has raised serious concerns for the wellbeing of their community. What once was a block with a spirit of mutual trust now is fractured.

### *Aleida Delgado and Aleida Roman*

123.    Plaintiffs Aleida Delgado and Aleida Roman are longtime residents of Brooklyn, New York. They live together in an apartment in the NYCHA Williamsburg Houses.

124.    Ms. Delgado and Ms. Roman have organized with their neighbors to address rent increases, health hazards, maintenance issues, and accessibility problems with Wavecrest Management ("Wavecrest"), the private company that manages their NYCHA building.

### *Surveillance Throughout the City*

125.    Ms. Delgado and Ms. Roman feel the reach of the DAS throughout the city. Both report a pervasive awareness of cameras when traveling around the city, whether by foot,

rideshare, or subway, including regular trips between Brooklyn and Manhattan. Both are aware that their activism and associations have placed them under heightened scrutiny, including warrantless surveillance, chilling their ability to exercise their rights freely.

126. Ms. Delgado and Ms. Roman are recorded by DAS cameras, trackers, scanners, and electronic monitoring technologies as they move about the city by foot, transit, and car, including rideshare and with relatives. Both are aware of pervasive surveillance as they move throughout the city because of the concentration of surveillance cameras around their home and neighborhood. On a short walk from their street to the entrance of their building, Ms. Delgado and Ms. Roman encounter at least 12 NYPD and Wavecrest cameras, which also connect to the DAS. On a single car ride, a navigation application alerted them to countless police cameras and scanners photographing the vehicle and recording their movements.

127. On regular trips to church, doctors' offices, and the grocery store, Ms. Delgado and Ms. Roman count dozens of police cameras. Ms. Roman recalls passing through countless cameras and scanners on regular rideshare trips between Brooklyn and Manhattan for physical therapy appointments. Ms. Delgado stopped using a pharmacy near her home to protect her confidential health information from the gaze of the NYPD camera positioned directly outside.

128. Ms. Delgado and Ms. Roman have frequently observed police helicopters hovering over their neighborhood for long periods of time.

129. Aware of persistent surveillance, including the thick density of cameras and gunshot detectors around her apartment building, Ms. Roman tries to cover her face when she leaves the home, making even a short walk down the block more difficult. Wearing face coverings is particularly difficult because Ms. Delgado and Ms. Roman both suffer from asthma, placing the privacy of their movements at odds with their health. Ms. Roman's distress is further

magnified when agents and affiliates of Wavecrest comment to Ms. Roman that they are aware of her whereabouts, based on footage from cameras that the NYPD also accesses through DAS.

*Surveillance Online*

130.    A technician entered Ms. Delgado and Ms. Roman's apartment without notice or consent and installed a router, which they were told would provide free internet for five years. Ms. Delgado and Ms. Roman did not sign a contract related to this internet service. DAS surveils NYCHA residents' online activity under the guise of such "free" broadband provided by the City. Aware of this continuous monitoring, Ms. Delgado and Ms. Roman try to avoid using this "free" internet when possible.

131.    Ms. Delgado and Ms. Roman regularly make phone calls and use internet payment platforms that are known to be monitored by DAS, folding their private communications and transactions into the NYPD's vast repository of information about them.

132.    They also use social media platforms that are monitored by DAS, causing Ms. Roman to curtail her social media activity and online activism because of surveillance and fear of retaliation. She hesitates to gather in groups or engage in public or online expression with other artists and limits her associations with other advocates, undermining the efficacy of her work and eroding her sense of community.

133.    Ms. Roman maintains some public-facing presence on social media because of her community organizing work. She is concerned that this online visibility allows her associations to be linked to her physical movements as recorded by the DAS, placing herself, family, friends, and supporters at risk of retaliation for their advocacy, including by Wavecrest and the NYPD.

*Surveillance at Home*

134.    They are also watched at home. As longtime residents at the NYCHA Williamsburg Houses, Ms. Delgado and Ms. Roman have seen DAS surveillance transform their home into a space of anxiety. Ms. Delgado and Ms. Roman live under the constant gaze of DAS surveillance as four NYPD cameras mounted outside their apartment point toward the kitchen and bedroom windows of their unit, peering into the interior of their home. They have witnessed the cameras panning and tilting. Several more Wavecrest cameras also point toward the windows of the unit, including one positioned directly outside the living room window at close range. All are visible from the interior of the unit—including from the bathroom entrance, connecting hallways, and bedrooms—recording the intimate details of Ms. Delgado and Ms. Roman's movements and activities inside their own home.

135.    The surveillance cameras extend to the interior of the building, including in the lobby, hallways, and common areas.

136.    Ms. Delgado and Ms. Roman have covered their windows with blackout materials and black tape to attempt to block the cameras' view, depriving themselves of sunlight, breeze, and the simple enjoyment of looking outside. Ms. Roman has sustained physical injuries while installing materials to try to limit the view of the cameras pointed into her apartment. Ms. Delgado describes the omnipresent surveillance as a daily violation, one that has left her unable to feel at ease in and around her own home. Both women feel incredibly violated knowing the cameras have recorded and stored footage of them undressing in what should have been the privacy of their own home.

137.    Due to their organizing, Ms. Delgado and Ms. Roman have faced retaliation from individuals affiliated with Wavecrest who frequently photograph Ms. Delgado and Ms. Roman around their home and at community board meetings attended by NYPD officers.

138.    Knowing they are being monitored, Ms. Delgado and Ms. Roman have become less active in their tenants' association and more isolated from their neighbors, fearing further reprisals.

139.    The presence of the cameras in and around their home has inflicted ongoing emotional distress. The constant surveillance has serious health implications, as Ms. Delgado and Ms. Roman both suffer from chronic illnesses. The inability to feel comfortable in and around the home heightens their stress and anxiety, exacerbating physical symptoms. For Ms. Delgado, who uses a wheelchair, loss of access to fresh air and sunlight in her home takes a significant toll. Although she loves the outdoors, Ms. Delgado increasingly stays inside—with the windows blocked—to avoid surveillance, thus reducing her access to activity and refreshment important for her physical and mental well-being.

140.    Yet persistent surveillance has not provided safety. When Ms. Delgado and Ms. Roman filed a police report on behalf of their neighbor, the police stated there was no usable footage because the camera lenses were too dirty. In another instance, after a break-in, the police advised Ms. Delgado they would see if they could access the Wavecrest cameras but then never followed up. Ms. Delgado and Ms. Roman object to the intense surveillance of their home as endangering their safety, as the thick density of cameras inside and outside their building has created more opportunities for abuse of power by police, management, and other actors who may obtain access to the footage.

141. On another occasion, a police officer showed Ms. Delgado and Ms. Roman how she could access the feeds from both the NYPD and Wavecrest cameras at the Williamsburg Houses—including the cameras inside the buildings—from a mobile device. The officer showed Ms. Delgado and Ms. Roman high quality live and retrospective footage from the cameras.

142. The DAS surveillance has also eroded Plaintiffs' sense of community. Ms. Delgado and Ms. Roman feel a sense of fear in and around their own home, and their neighbors have also been deterred from participating in the tenants' association and other forms of community engagement and activism. Those who do organize speak in code and struggle to find safe places to meet without being watched, as cameras monitor the hallways and common spaces. Ms. Delgado and Ms. Roman object to the intense surveillance of their building and neighborhood—both online and offline—that unfairly targets the Black and Brown children in the Williamsburg Houses, raising serious concerns for the wellbeing of their community.

### *Andrea Ortiz*

143. Plaintiff Andrea Ortiz is a longtime resident of Brooklyn, New York.

144. Ms. Ortiz is an education policy organizer for a coalition comprising public-school teachers, students, parents, and advocates concerned with school safety and disciplinary equity. She regularly travels to schools across the city to meet with students and their families and to provide trainings on their rights.

#### *Surveillance Throughout the City*

145. Ms. Ortiz is recorded by DAS cameras, trackers, scanners, and electronic monitoring technologies as she moves about the city by foot, transit, and car, including rideshare and with friends. This omnipresent surveillance includes cameras on her block, in subway stations, and at every public school she visits.

146.    DAS cameras capture Ms. Ortiz from the moment she steps outside her building. She passes them running errands and walking through her neighborhood to meet friends. On a recent afternoon, she counted over fifteen cameras on a short walk to a nearby bar. When she uses the subway, MTA cameras connected to the DAS track her movements, too. She is further concerned that her transit fares generate significant location data stored about her commute.

147.    The same surveillance extends into Ms. Ortiz's professional activities. Her work requires her to travel regularly by subway and on foot to public schools across the city. At virtually every school she enters, NYPD school safety agents and security cameras monitored by the NYPD are the first thing she sees. These cameras, which educators have told Ms. Ortiz are capable of 360-degree movement, provide the NYPD with a complete view of her movements while she is in a school.

148.    Ms. Ortiz is surveilled at school events themselves, but also in the course of her advocacy on behalf of teachers, students, and parents at Department of Education and City Council hearings.

149.    Because of DAS surveillance, Ms. Ortiz has curtailed some of her advocacy efforts for fear of retaliation against the immigrant students and families she represents. On several occasions, she has had to advise youth or their parents, particularly immigrant families, that certain advocacy activities may no longer be safe to undertake due to the risks posed by DAS surveillance. Ms. Ortiz and her fellow advocates also avoid discussing certain topics on school premises, because of surveillance and fear of retaliation, which causes difficulty in finding large enough spaces to host advocacy events.

150.    Surveillance of herself, her fellow advocates, and the educators and families she represents causes Ms. Ortiz ongoing emotional distress. Her stress and anxiety have been

exacerbated by fears that advocacy activities could put children and families she works with at risk of deportation. It also takes a significant physical and emotional toll on Ms. Ortiz to regularly hear children she works with talk about how their first interaction with school is NYPD surveillance in the form of metal detectors, pat-downs, or omnipresent security cameras. Ms. Ortiz has witnessed NYPD surveillance transform public schools into a place of fear—for herself, students, educators, and parents alike. Though Mr. Ortiz seeks to empower youth to advocate for themselves and their communities, many students no longer feel safe to share their stories in an environment replete with police surveillance. Ms. Ortiz is further concerned that DAS surveillance of the children she works with disproportionately impacts Black and Brown children through inclusion in the NYPD's GANGS database.

151.    Although Ms. Ortiz has been a committed activist throughout her career, she now has additional fears and takes further precautions before attending public demonstrations because DAS surveillance enables the NYPD to link her presence to her work and expose her or the families she represents to retaliation.

*Surveillance Online*

152.    Ms. Ortiz's work requires her to maintain a public-facing presence on social media, where her organization posts about trainings, events, and advocacy activities at specific schools and government buildings. She is concerned that this online visibility allows her professional identity and associations to be linked to her physical movements as recorded by the DAS, placing herself and others at risk of retaliation for their advocacy.

153.    Ms. Ortiz regularly makes phone calls and uses internet payment platforms that are known to be monitored by DAS, folding her private communications and transactions into the NYPD's vast repository of information about her.

*Surveillance at Home*

154.    Ms. Ortiz is also surveilled by the DAS cameras on her block and in her neighborhood.

## CLASS ACTION ALLEGATIONS

155.    Plaintiffs Sauve, Wridt, Delgado, Roman, and Ortiz bring this suit as a class action under Federal Rule of Civil Procedure 23(b)(1)(A), (b)(2) and (b)(3), on behalf of themselves and other individuals similarly situated.

156.    Definition. Plaintiffs seek to represent a class of persons who have been or are likely to be subjected to warrantless surveillance by DAS who reside in New York City or resided therein between October 27, 2022 and the present (the "Class").

157.    The claims and practices alleged herein are common to all members of the Class.

158.    All of the members of the Class have been and will continue to be injured as a result of Defendant's conduct.

159.    This action is properly maintainable as a class action because all four requirements of Federal Rule of Civil Procedure 23(a) are satisfied.

160.    Numerosity. The members of the Class are so numerous that joinder of all Class members is impracticable. Over eight million people live in the city under the constant gaze of DAS as they go about their daily lives.

161.    Commonality. The questions of law and fact presented by Plaintiffs Sauve, Wridt, Delgado, Roman, and Ortiz are common to other members of the Class. Questions of law and fact common to the Class include:

a. Whether DAS surveillance violates the Fourth Amendment rights of the Class through search and seizure without a warrant;

b. Whether DAS surveillance violates the First Amendment rights of the Class, including by deterring, preventing, or chilling free association and expression;

c. Whether Class members are entitled to relief and, if so, the nature and extent of that relief, including without limitation the amount of monetary damages; and

d. Whether, and what, injunctive and declaratory relief is necessary to rectify the violations described in this Complaint.

162. These questions of fact and law common to the class are susceptible to common resolution and will generate common answers with respect to all members of the class, including what are the appropriate remedies that will be necessary to ensure (i) that the unconstitutional conduct at issue in this lawsuit, and the policies and practices that perpetuate it are terminated, and (ii) that their harmful effects are nullified.

163. Typicality. The violations suffered by Plaintiffs Sauve, Wridt, Delgado, Roman, and Ortiz are typical of those suffered by the Class, as all members of the Class have and will likely continue to be subject to unconstitutional surveillance by DAS by living in or moving about the city. The Named Plaintiffs, like all Class members, have been subjected to the Defendant's policies and practices and have been injured by Defendant's conduct, and require similar relief.

164. Adequacy. Plaintiffs have no conflict of interest with any Class members, are committed to the vigorous prosecution of all claims on behalf of the Class, and will fairly and adequately protect the interests of the Class. Counsel competent and experienced in federal class action and federal civil rights litigation has been retained to represent the class. Emery Celli

Brinckerhoff & Abady LLP is a law firm with offices in New York City with extensive experience in complex civil rights litigation and class action lawsuits. The Surveillance Technology Oversight Project is a non-profit organization in New York City with substantial experience in civil rights and privacy litigation.

165.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(1)(A) because the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendant.

166.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because the City has acted or refused to act on grounds that apply generally to the Class, in that each member of the Class has suffered, is suffering, or is at risk of suffering violations stemming from warrantless intrusions into the privacy of their movements, expressions, and associations. Accordingly, final injunctive relief bringing DAS's policies and practices into compliance with the Fourth and First Amendments is appropriate respecting the Class as a whole.

167.     Defendant has acted, or omitted to act, on grounds generally applicable to the class, thereby making appropriate injunctive relief with respect to the class as a whole. Every present and future resident of the city would benefit from an order enjoining and directing Defendant to cease the challenged unconstitutional conduct and the policies and practices that perpetuate such conduct.

168.     This action is properly maintainable as a class action because the requirements of Federal Rule of Civil Procedure 23(b)(3) are satisfied.

169.     Predominance. Common issues of law and fact, including without limitation those set forth above, predominate over any individual issues.

170.     Superiority. This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable. The damages suffered by members of the Class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation; therefore, it is highly impractical for such Class members to seek individual redress for damages. Prosecution of separation actions would lead to duplicative lawsuits and the risk of inconsistent judgments and would unduly burden the courts.

171.     There will be no extraordinary difficulty in the management of this Class action.

**FIRST CAUSE OF ACTION**
**Fourth Amendment**
**(42 U.S.C. § 1983)**

172.     Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

173.     Plaintiffs bring this claim on their own behalf and on behalf of the Class.

174.     42 U.S.C. § 1983 prohibits any person acting under color of state law, custom, or usage to deprive a citizen of rights secured by the Constitution.

175.     Defendant's widespread and persistent warrantless DAS surveillance violates the Fourth Amendment because it infringes upon a reasonable expectation of privacy in the whole of the movements of Plaintiffs and the Class and captures information about their privacies of life.

176.     First, this program results in indiscriminate searches of Plaintiffs and the Class lacking any individualized suspicion or judicial approval, which are prohibited by the Fourth Amendment, and no exception to the Fourth Amendment's warrant requirement applies.

177.     Second, Defendant's use and analysis of information collected through the DAS absent judicial authorization also violates the Fourth Amendment.

178.     And third, Defendant's procedures governing this surveillance are constitutionally unreasonable.

179.     Defendant acted, pursuant to an official municipal policy, under pretense and color of state law, in abuse of powers and beyond the scope of Defendant's authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiffs and the Class of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth Amendment to the United States Constitution.

180.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs and the Class sustained the damages hereinbefore alleged.

### SECOND CAUSE OF ACTION
#### First Amendment
#### (42 U.S.C. § 1983)

181.     Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

182.     Plaintiffs bring this claim on their own behalf and on behalf of the Class.

183.     42 U.S.C. § 1983 prohibits any person acting under color of state law, custom, or usage to deprive a citizen of rights secured by the Constitution.

184.     At all relevant times, Defendant acted under color of state law.

185.        Under the First Amendment to the Constitution of the United States of America, Plaintiffs and the Class have the right to free association and free expression.

186.        Defendant's warrantless DAS surveillance program violates the First Amendment because its constant and inescapable monitoring deters and prevents, or is likely to deter or prevent, the Class, including Plaintiffs, from free association and free expression, infringing on that right. DAS surveillance also enables the NYPD to reconstruct where Plaintiffs and the Class were in the past, revealing protected expressive and associational activities.

187.        As a direct and proximate result of Defendant's unlawful widespread, unconstitutional conduct, pursuant to official municipal policy, Plaintiffs and the Class have sustained the damages hereinbefore alleged.

**THIRD CAUSE OF ACTION**
**State Constitution Right to Privacy**
**N.Y. Cont. Art. 1, § 12**

188.        Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

189.        Defendant's actions or inactions alleged herein have violated and continue to violate the privacy rights of the named Plaintiffs and the Class under Article 1, § 12 of the New York State Constitution.

190.        As a direct and proximate result of Defendant's unlawful widespread, unconstitutional conduct, pursuant to official municipal policy, Plaintiffs and the Class have sustained the damages hereinbefore alleged.

## FOURTH CAUSE OF ACTION
### State Constitution Right to Free Speech, Expression, and Association
### N.Y. Cont. Art. 1, § 8

191.     Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

192.     Defendant's actions or inactions alleged herein have violated and continue to violate the free speech, expression, and association rights of the named Plaintiffs and the Class under Article 1, § 8 of the New York State Constitution.

193.     As a direct and proximate result of Defendant's unlawful widespread, unconstitutional conduct, pursuant to official municipal policy, Plaintiffs and the Class have sustained the damages hereinbefore alleged.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendant as follows:

a.  Declaring that the policies, practices, and acts of Defendant with regard to the DAS described here are unlawful and violate the First and Fourth Amendments to the Constitution of the United States and Article I, sections 8 and 12 of the Constitution of the Starte of New York.

b.  Enjoining Defendant, Defendant's agents, employees, successors, and all other persons in active concert or participation with Defendant from DAS surveillance until remedial measures are developed and implemented to safeguard the First and Fourth Amendment rights of those subjected to the scope of the DAS;

c.  Ordering Defendant to expunge all records of Plaintiffs and the Class created and maintained as a result of the unconstitutional and unlawful practices described herein;

d.  Ordering Defendant to foreclose and discontinue the operation of DAS cameras situated so as to monitor residential streets in a manner that captures the private spaces of residences, including Named Plaintiffs' homes;

e.  Ordering Defendant to delete all data stored in the DAS after 30 days;

f.  Enjoining Defendant from accessing DAS data absent a warrant;

g.  Awarding such damages to Plaintiffs and the Class as will fully compensate them for their loss of rights and emotional distress suffered due to Defendant's unlawful conduct;

h.  Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

i.  Granting all such other further relief as may be just and proper.

Dated: New York, New York
      April 6, 2025

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: _____
    O. Andrew F. Wilson
    Sara Luz Estela
    Adam Nasser
    One Rockefeller Plaza, 8th Floor
    New York, New York 10020
    (212) 763-5000

SURVEILLANCE TECHNOLOGY
OVERSIGHT PROJECT, INC.
    Michelle Dahl
    Darío Maestro
    40 Rector Street, 9th Floor
    New York, New York 10006
    (212) 518-7573

*Attorneys for Plaintiffs*