Case No. 25-cv-08903 (ALC)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAMELA WRIDT; ROBERT SAUVE;
ALEIDA DELGADO; ALEIDA ROMAN;
and ANDREA ORTIZ individually and on
behalf of a class of all others similarly
situated,

Plaintiffs,

-against-

CITY OF NEW YORK,

Defendant.

**DEFENDANT'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION TO DISMISS THE
AMENDED COMPLAINT**

***STEVEN BANKS***
*Corporation Counsel of the City of New York*
*Attorney for Defendant*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel:  Andrea Liberatore*
*Tel:  (212) 356-3187*
*aliberat@law.nyc.gov*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... III

PRELIMINARY STATEMENT ............................................................................. 1

FACTUAL BACKGROUND.................................................................................. 3

      A.  NYPD Technology and POST Act Disclosures ............................................ 3

           1.  LPRs ........................................................................................4

           2.  ShotSpotter ..............................................................................5

           3.  CCTV Cameras........................................................................6

      B.  Allegations Regarding Plaintiffs........................................................... 7

           1.  Pamela Wridt and Robert Sauve...........................................7

           2.  Aleida Delgado and Aleida Roman ........................................8

           3.  Andrea Ortiz ..........................................................................10

LEGAL STANDARDS ........................................................................................ 11

ARGUMENT

      POINT I

           PLAINTIFFS LACK ARTICLE III STANDING BECAUSE THEY FAIL TO ALLEGE HOW NYPD'S USE OF DAS HAS INJURED THEM OR HOW THEIR REQUESTED RELIEF WILL REMEDY THEIR PURPORTED INJURIES...................................................13

           A.  Plaintiffs Fail to Establish Injury-in-Fact ...................................... 13

               1.  Fourth Amendment Claim.....................................................14

               2.  First Amendment Claim ........................................................18

            B.  Plaintiffs Fail to Establish Redressability...................................... 21

**Page**

POINT II

      PLAINTIFFS FAIL TO STATE A FOURTH
      AMENDMENT CLAIM ............................................................................. 23

      A.  The Alleged DAS Surveillance Does Not Give Rise to
          a Fourth Amendment Claim ........................................................... 23

      B.  Plaintiffs' Allegations Do Not Plead the Fourth
          Amendment Violations Recognized by *Carter* and its
          Progeny ......................................................................................... 26

POINT III

      PLAINTIFFS FAIL TO STATE A FIRST AMENDMENT
      CLAIM ................................................................................................... 27

POINT IV

      PLAINTIFFS FAIL TO PLEAD MUNICIPAL
      LIABILITY ............................................................................................ 29

POINT V

      PLAINTIFFS' STATE CONSTITUTIONAL CLAIMS
      FAIL ...................................................................................................... 29

CONCLUSION ...................................................................................................... 30

CERTIFICATE OF COMPLIANCE ....................................................................... 31

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Allen v. Antal,*
    665 F. App'x 9 (2d Cir. 2016) ................................................................................... 29-30

*Alwan v. City of New York,*
    311 F. Supp. 3d 570 (E.D.N.Y. 2018) ...........................................................................30

*Am. C.L. Union v. Nat'l Sec. Agency,*
    493 F.3d 644 (6th Cir. 2007) .........................................................................................18

*Amidax Trading Grp. v. S.W.I.F.T. SCRL,*
    671 F.3d 140 (2d Cir. 2011)...........................................................................................14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)........................................................................................................12

*Baur v. Veneman,*
    352 F.3d 625 (2d Cir. 2003)....................................................................................14, 18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).......................................................................................................12

*California v. Ciraolo,*
    476 U.S. 207 (1986).................................................................................................23, 24

*Canning v. Admin. for Children's Servs.,*
    588 F. App'x 48 (2d Cir. 2014) .....................................................................................11

*Carpenter v. United States,*
    585 U.S. 296 (2018).................................................................................................26, 27

*Cerame v. Slack,*
    123 F.4th 72 (2d Cir. 2024) ...........................................................................................19

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)....................................................................................14, 15, 18, 19

*Daly v. Citigroup Inc.,*
    939 F.3d 415 (2d Cir. 2019)...........................................................................................11

*DiFolco v. MSNBC Cable L.L.C.,*
    622 F.3d 104 (2d Cir. 2010)...........................................................................................12

*Fifth Ave. Peace Parade Comm. v. Gray,*
    480 F.2d 326 (2d Cir. 1973)....................................................................................19, 21

**Cases**                                                                                   **Pages**

*G.B. v. Nassau Cnty.*,
   751 F. Supp. 3d 56 (E.D.N.Y. 2024) .................................................................22

*Gaston v. Gavin*,
   No. 97 Civ. 1645 (JGK), 1998 WL 7217
   (S.D.N.Y. Jan. 8, 1998),
   *aff'd*, 172 F.3d 37 (2d Cir. 1998) ...................................................................28

*Handschu v. Special Servs. Div.*,
   475 F. Supp. 2d 331 (S.D.N.Y. 2007),
   *vacated on other grounds*,
   No. 71 Civ. 2203(CSH), 2007 WL 1711775
   (S.D.N.Y. June 13, 2007)....................................................................20, 21, 28

*Hogan v. Mahabir*,
   No. 22-cv-07858HGCLP, 2023 WL 3628554
   (E.D.N.Y. May 24, 2023) .................................................................................12

*J.S. v. Attica Cent. Sch.*,
   386 F.3d 107 (2d Cir. 2004).............................................................................12

*Katz v. United States*,
   389 U.S. 347 (1967)...................................................................................23, 25

*Kyllo v. United States*,
   533 U.S. 27 (2001)............................................................................................24

*Laird v. Tatum*,
   408 U.S. 1 (1972).................................................................18, 19, 20, 21, 27, 28

*Lovell v. Consol. Edison Co. of N.Y.*,
   758 F. App'x 222 (2d Cir. 2019) ................................................................. 21-22

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)................................................................... 13-14, 14, 22, 23

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000).......................................................................11, 12

*Monell v. Dep't of Soc. Servs. of City of New York*,
   436 U.S. 658 (1978)..........................................................................................29

*Nat'l Org. for Marriage, Inc. v. Walsh*,
   714 F.3d 682 (2d Cir. 2013).............................................................................18

**Cases**                                                                                                                    **Pages**

*Noriega v. Abbott Laboratories*,
714 F. Supp. 3d 453 (S.D.N.Y. 2024)..................................................................................12

*Norton v. Town of Islip*,
678 F. App'x 17 (2d Cir. 2017) ...........................................................................................29

*Nour v. New York City Police Dep't*,
No. 92 CIV. 7066 (JFK), 1995 WL 42319
(S.D.N.Y. Feb. 2, 1995).............................................................................................27, 28

*Rinaldi v. Sylvester*,
No. 24-CV-272 (KMK), 2025 WL 2682691
(S.D.N.Y. Sept. 19, 2025).........................................................................................24, 27

*Rivera v. Putnam Cnty.*,
No. 22 CV 1877 (VB), 2023 WL 3601720
(S.D.N.Y. May 23, 2023)...................................................................................................29

*Scholl v. Illinois State Police*,
776 F. Supp. 3d 701 (N.D. Ill. 2025) ...............................................................................16

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)............................................................................................................13

*Talarico v. Port Auth. of New York & New Jersey*,
367 F. Supp. 3d 161 (S.D.N.Y. 2019)...............................................................................30

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
581 U.S. 433 (2017)............................................................................................................13

*United Presbyterian Church in the U.S.A. v. Reagan*,
738 F.2d 1375 (D.C. Cir. 1984) ...........................................................................19, 20, 21

*United States v. Davis*,
326 F.3d 361 (2d Cir. 2003)...............................................................................................23

*United States v. Dennis*,
41 F.4th 732 (5th Cir. 2022) ..............................................................................................26

*United States v. Harry*,
130 F.4th 342 (2d Cir. 2025) ...........................................................................23, 24, 26, 27

*United States v. Hay*,
95 F.4th 1304 (10th Cir. 2024),
*cert. denied*, 145 S. Ct. 591 (2024)...........................................................................24, 25

**Cases**                                                                                                    **Pages**

*United States v. Knotts*,
    460 U.S. 276 (1983)......................................................................................................23

*United States v. Meregildo*,
    883 F. Supp. 2d 523 (S.D.N.Y. 2012).........................................................................25

*United States v. Tuggle*,
    4 F.4th 505 (7th Cir. 2021),
    *cert. denied*, 142 S. Ct. 1007 (2022).........................................................................27

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
    454 U.S. 464 (1982).....................................................................................................14

**Statutes**

42 U.S.C. § 1983........................................................................................................29, 30

Fed. R. Civ. P. 12(b)(1).........................................................................................2, 11, 12

Fed. R. Civ. P. 12(b)(6)................................................................................................2, 12

N.Y.C. Admin. Code § 14-188(a)........................................................................................3

## PRELIMINARY STATEMENT

Plaintiffs are five New York City citizens who bring this putative class action seeking to challenge the NYPD's use of a technology platform called the Domain Awareness System ("DAS"). Plaintiffs contend that NYPD uses DAS to spy on them, as well as the City's roughly 8.5 million other residents, in violation of the First and Fourth Amendments. According to Plaintiffs, DAS is an "AI-supercharged surveillance platform" that allows NYPD to "effortlessly generate[] detailed portraits" of the lives of every New Yorker by combining a slew of purported surveillance technologies that chart the relationships, religious beliefs, political affiliations, and movements of all who live in the City. *See* ECF No. 22 (the "Amended Complaint") ¶ 81.

The impossibility of Plaintiffs' far-fetched allegations become even more apparent when compared against the mandated disclosures NYPD provides regarding its technology pursuant to the Public Oversight of Surveillance Technology Act ("POST Act"), which Plaintiffs rely on heavily throughout the Amended Complaint. *See, e.g.*, Am. Compl. ¶¶ 29 n.8-9, 31 n.11. Indeed, Plaintiffs' attack on DAS rests on the faulty premise that DAS itself somehow "surveils" all New Yorkers—but as the POST Act disclosures reflect, DAS itself is not a surveillance tool, like a camera, that collects and records information. Rather, it is a technology platform that allows authorized NYPD personnel to access lawfully obtained data otherwise held in separate areas and gathered from a limited group of databases and technologies (e.g., CCTV cameras and license plate readers). Despite Plaintiffs' allegations to the contrary, DAS does not create "digital profiles" on all New Yorkers to reconstruct "the private lives of millions," or "track individuals across space and time." *See* Am. Compl. ¶¶ 2, 23.

Beyond the Amended Complaint's erroneous characterizations of DAS and its abilities, it also fails to establish Plaintiffs' standing to challenge NYPD's use of DAS. The Amended Complaint does not meaningfully explain how Plaintiffs have been personally subjected to and

injured by NYPD's use of DAS. Nor does the Amended Complaint allege that NYPD has or will aggregate data regarding any of the Plaintiffs through DAS. Instead, a careful review of the Amended Complaint reveals that Plaintiffs' purported injuries arise solely from their vague "awareness" of cameras and sensors in public areas throughout the city, and their "concerns" regarding how NYPD might, hypothetically, collect and aggregate their publicly available data in the future. Moreover, the Amended Complaint fails to explain how its requested relief, which essentially calls for the elimination of DAS, would address Plaintiffs' purported injury, since DAS only allows NYPD to access information generated from other sources, such as CCTV cameras or license plate readers, that would continue to exist independently of DAS. Even if Plaintiffs had standing to challenge the purported "DAS surveillance" that they have been allegedly subjected to, the Amended Complaint fails to allege more than NYPD's passive collection of information that Plaintiffs have knowingly exposed to the public, and therefore fails to allege a claim under either the United States or New York State Constitutions.

Defendant City of New York respectfully requests that the Court dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiffs lack standing to bring their challenge to the purported DAS surveillance because they fail to establish injury-in-fact and redressability. Even if Plaintiffs had standing, their allegations do not rise to the level of a constitutional violation, and fail to plead municipal liability. Finally, Plaintiffs' state constitutional claims fail for the additional reason that Plaintiffs have an alternative remedy. For these reasons, Defendant respectfully requests that the Court dismiss the Amended Complaint with prejudice.

**FACTUAL BACKGROUND**[1]

**A.  NYPD Technology and POST Act Disclosures**

In 2020 the New York City Council enacted the POST Act, which requires NYPD to publish public impact and use policy statements for its surveillance technologies. By law, these impact and use policies must disclose several details regarding any technology "capable of, or used or designed for, collecting, retaining, processing, or sharing audio, video, location, thermal, biometric, or similar information," including the technology's capabilities, use, related policies and procedures, protections against unauthorized usage, and public access. *See* N.Y.C. Admin Code § 14-188 (a) (defining "surveillance technology" and "surveillance technology impact and use policy"). Pursuant to the POST Act and subsequent amendments, NYPD maintains updated impact and use policies for each distinct technology,[2] including DAS.[3]

While DAS is a "surveillance technology" for purposes of the POST Act, it is not a data-gathering tool that collects or gathers information on its own. Rather, DAS is a technology platform that centralizes lawfully obtained information otherwise kept throughout different NYPD data

---

[1] For the purposes of this motion, the facts alleged in the Amended Complaint and incorporated documents are deemed to be true.

[2] *See* NYPD, Public Oversight of Surveillance Technology (POST) Act Impact and Use Policies, https://www.nyc.gov/site/nypd/about/about-nypd/policy/post-act.page (last visited June 3, 2026).

[3] Throughout the Amended Complaint, Plaintiffs cite several impact and use policy statements maintained on NYPD's government website. *See, e.g.*, Am. Compl. ¶¶ 29 n.8-9, 52 n.25, 60 n.29. The POST Act was amended in 2025 to require NYPD to provide additional details regarding its surveillance technology. *See* Local Law 2025/56. Where applicable, Defendant cites to the most recent policies for relevant NYPD technology, which were updated and finalized February 4, 2026.

compartments for legitimate law enforcement purposes.[4] For example, DAS allows authorized NYPD personnel to access previously-collected records in response to suspected criminal activity such as 911 calls, crime reports, arrest reports, criminal history, and a suspect's associated vehicle, address, and firearm license history. *See* DAS Impact and Use Policy at 4-5. As set forth in the DAS Impact and Use Policy, certain information previously-collected from three separate data collection technologies may also be accessible to authorized NYPD personnel in DAS to assist with criminal investigations or respond to immediate safety threats—(1) information from license plate readers ("LPRs"); (2) the time and locations of gunshots through ShotSpotter, and (3) limited footage from CCTV cameras. *See id.*

### 1.  LPRs

NYPD utilizes license plate readers or LPRs to locate vehicles that are connected to suspected criminal activity such as stolen vehicles, AMBER alerts, Silver alerts, abductions, or missing persons.[5] LPRs are specialized cameras that capture only the images of license plate numbers affixed to passing vehicles. *See* LPRs Impact and Use Policy at 4. The image is then converted to text and compared against administrative databases containing enumerated lists of license plates of interests, such as those associated with stolen vehicles. *Id.* The field-of-view of LPRs utilized by NYPD is strictly limited to public areas and locations. *Id.* LPR data is stored for

---

[4]  *See* NYPD, *Domain Awareness System: Impact and Use Policy* (Feb. 4, 2026) https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/Domain-Awareness-System-NYPD-Impact-and-Use-Policy-2.4.26-FINAL.pdf (the "DAS Impact and Use Policy") at 4-5.

[5]  NYPD, *License Plate Readers: Impact and Use Policy* (Feb. 4, 2026) https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/License-Plate-Readers-NYPD-Impact-and-Use-Policy-2.4.26-FINAL.pdf (the "LPRs Impact and Use Policy").

five years and can be accessed through DAS. *Id.* at 7. NYPD's LPR technology cannot be used to track a vehicle in real-time and does not use any biometric measurement technologies. *Id.* at 4.

### 2. ShotSpotter

ShotSpotter is a gunshot detection system which alerts NYPD personnel of possible gunfire incidents.[6] ShotSpotter sensors are located high above street level in open, public locations and uses ordinary microphone technology. ShotSpotter Impact and Use Policy at 4. These sensors are designed to pick up gunshot-like sounds, and cannot trigger an alert based on human voices. *Id.* When at least three ShotSpotter sensors detect a gunshot-like sound, the precise time, location, and short audio snippet of the noise is transmitted to the ShotSpotter Incident Review Center where a trained human analyst determines whether the sound was gunfire, or a similar sound, such as a firework. *Id.* The audio snippet recorded consists only of one second before the gunshot sound, the gunshot sound, and one second after. *Id.* If the ShotSpotter Incident Review Center determines that the sound was a possible gunfire, an alert will appear in DAS that triggers the review and assignment of any subsequent investigation by authorized NYPD personnel. *Id.* at 4. ShotSpotter sensors store only twenty-four hours of audio, which is automatically deleted on a first-in-first-out basis. *Id.* at 6. Audio from ShotSpotter sensors are only transmitted to the ShotSpotter Incident Review Center if a possible gunfire shot is detected and solely audio confirmed to be a gunfire incident is retained for longer than 24 hours. *Id.* at 6. Only confirmed gunfire event data can be accessed by authorized NYPD personnel through DAS. *Id.* at 4. NYPD personnel are not able to access audio retained in ShotSpotter sensors or live stream sensor audio. *Id.* at 4, 6.

---

[6]    NYPD, *ShotSpotter:    Impact    and    Use    Policy*    (Feb.    4,    2026) https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/ShotSpotter-NYPD-Impact-and-Use-Policy-2.4.26-FINAL.pdf (the "Shot Spotter Impact and Use Policy").

### 3. CCTV Cameras

The field-of-view of all CCTV cameras throughout the City either installed or accessed by NYPD is strictly limited to areas that are open and accessible to the public.[7] CCTV footage is not stored in DAS. *See* DAS Impact and Use Policy at 5. Rather, CCTV footage is retained for thirty (30) days on device hard drives which automatically overwrite previously-recorded video. *See* CCTV Impact and Use Policy at 7. CCTV footage can neither be downloaded nor stored in DAS. *See* DAS Impact and Use Policy at 5. While CCTV footage may be accessed through DAS, access is restricted by rank, geographical areas of employment, and assignment. CCTV Impact and Use Policy at 5. Access is adjusted or removed once an officer's assignment no longer requires its use. *Id.* at 5. To access CCTV systems that are owned by external entities, the external entity must first provide NYPD with access rights. *Id.* at 4. CCTV systems do not use video analytics or biometric measurement technologies, nor do they have the capacity to perform real-time facial recognition. *See id.* at 10.[8] In very limited authorized uses,[9] a still image of CCTV footage may be used as a probe image to run through NYPD's facial recognition technology which compares images to a photo repository that consists solely of unsealed arrest and parole photographs of individuals that have been charged with a crime. *See id.* at 5 n.3; *see also* Facial Recognition Impact and Use Policy

---

[7] NYPD, *Closed-Circuit Television Systems: Impact Use and Policy* (Feb. 4, 2026), https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/CCTV%20-Systems-NYPD-Impact-and-Use-Policy-2.4.26-FINAL.pdf (the "CCTV Impact and Use Policy").

[8] *See also* NYPD, *Facial Recognition: Impact and Use Policy* (Feb. 4, 2026) https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/post-final/Facial-Recognition-NYPD-Impact-and-Use-Policy-2.4.26-FINAL.pdf (the "Facial Recognition Impact and Use Policy) at 4.

[9] NYPD use of facial recognition technology is limited to six authorized uses. *See* Facial Recognition Impact and Use Policy at 5.

6

at 4-5. Probe images are never entered into and do not become a part of the facial recognition photo repository. Facial Recognition Impact and Use Policy at 4.

**B. Allegations Regarding Plaintiffs**

**1. Pamela Wridt and Robert Sauve**

Plaintiffs Pamela Wridt and Robert Sauve are residents of Brooklyn that share a home in the Bedford Stuyvesant neighborhood. Am. Compl. ¶ 107. Wridt is a children's rights advocate and researcher, and Sauve is a professional radio disc jockey. *Id.* ¶¶ 108-09.

Wridt and Sauve allege that "NYPD mounted a box with two cameras outside their home" that are "aimed at their living room and bedroom windows" and are able to "peer[] into the interior of their home." *Id.* ¶ 119. The presence of these two cameras has allegedly caused the loss of enjoyment and value to Wridt and Sauve's home as they now choose not to use their front yard, rent out their apartment unit, open the blinds, or open their windows widely for air. *Id.* ¶ 120. They also allege "ongoing emotional distress." *Id.* ¶ 120. Wridt and Sauve have "tinted their windows" to block the camera's view, but can allegedly still "see the cameras from inside their home" which "result[s] in persistent psychological distress." *Id.* ¶ 121.

Both Wridt and Sauve have also "frequently observed police helicopters hovering over their neighborhood for long periods of time." *Id.* ¶ 113. The couple is also "aware" of additional NYPD cameras further down their street and a gunshot detector "close to their home." *Id.* ¶ 112. The Amended Complaint does not allege that either Wridt or Sauve owns or operates a firearm. Additionally, Wridt and Sauve have allegedly observed drones flying over their back porch on multiple occasions, but do not allege that these drones were employed by NYPD or a City agency, or that the drones had any recording capabilities. *Id.* ¶ 119.

Beyond their neighborhood, Wridt generally alleges a "pervasive awareness of cameras wherever she travels, whether by foot, rideshare, or subway." *Id.* ¶ 110. She observes "at least two

7

police cameras recording her movements" during the "short ride from her home to the local YMCA" and "multiple NYPD cameras on her car rides from Brooklyn to Queens." *Id.* ¶ 111. One such camera is allegedly pointed at a community center she frequents inside a NYCHA Complex. *Id.* Sauve now chooses to wear welding sunglasses and a mask that fully covers his face, which obstructs his vision and causes discomfort, and minimizes the use of public transit to "avoid surveillance." *Id.* ¶ 114. The Amended Complaint does not allege that either Wridt or Sauve operates a vehicle in the City, or is associated with the license plate of any vehicle.

With respect to purported online surveillance, Wridt admits that she does not maintain a social media account. *Id.* ¶ 116. Sauve maintains a social media account to promote events as a DJ, but his accounts were set to private to avoid online surveillance. *Id.* ¶ 117. The Amended Complaint further alleges that the couple "regularly make phone calls and use internet payment platforms that are known to be monitored by DAS," but does not allege which phone services or internet platforms are used or how such activity is monitored by NYPD through DAS. *Id.* ¶ 118.

Neither Sauve nor Wridt alleges that they have been previously arrested by NYPD, have a criminal record, or have been involved in any criminal investigation. Sauve alleges that "he has been subjected to police surveillance and harassment since adolescence, beginning with stop-and-frisk encounters," and, at some unspecified time, has been photographed by NYPD officers at protests and "followed and spotlighted by [a] police helicopter." *Id.* ¶ 109. Wridt alleges that she has "engaged directly with [NYPD] regarding surveillance in her own neighborhood" through the "filing of a civilian complaint and records request." *Id.* ¶ 108.

### 2. Aleida Delgado and Aleida Roman

Plaintiffs Aleida Delgado and Aleida Roman are residents of Brooklyn that share an apartment together in a NYCHA building located in Williamsburg. *Id.* ¶ 123. The apartment building is managed by the private company, Wavecrest Management ("Wavecrest"). *Id.* ¶ 124.

8

Delgado and Roman allege that four NYPD cameras are mounted outside their apartment that "point toward the kitchen and bedroom windows of their unit" and are able to "peer[] into the interior of their home." *Id.* ¶ 134. "Several more Wavecrest cameras" are also pointed towards the apartment windows, and some Wavecrest cameras "extend to the interior of the apartment building, including in the lobby, hallways, and common areas." *Id.* ¶¶ 134, 135. Delgado and Roman have covered their windows to block the cameras view. Roman allegedly "sustained physical injuries" while installing materials to block the cameras' view of their home. *Id.* ¶ 136.

After filing a police report on behalf of a neighbor, Delgado and Roman were informed by a police officer that there was no video footage because the lenses of the cameras were too dirty. *Id.* ¶ 140. On another unspecified occasion, a police officer allegedly showed Delgado and Roman how "she could access the feeds from both NYPD and Wavecrest cameras" at their apartment building from a mobile device. *Id.* ¶ 141. Allegedly, the officer showed them "high quality live and retrospective footage from the cameras." *Id.* The Amended Complaint does not allege that this purported footage included footage of the exterior or interior of their apartment.

Delagado and Roman allege, without explanation, that "DAS surveils NYCHA residents' online activity" through free internet provided for NYCHA residents.[10] *Id.* ¶ 130. They allegedly avoid using it. *Id.* While Roman alleges that she "maintains some public-facing presence on social media," Delgado does not. *Id.* ¶ 132. The Amended Complaint further alleges that Delgado and Roman "regularly make phone calls and use internet payment platforms that are known to be

---

[10] Though the purported "free internet" referenced is not specified, New York City's Office of Technology and Innovation offers free and secure internet to NYCHA residents through the private service providers, Optimum and Spectrum. *See* NYCOTI, *Big Apple Connect*, https://www.nyc.gov/content/oti/pages/big-apple-connect#details.

monitored by DAS" but, like the other Plaintiffs, does not allege which phone services or internet platforms are used or how such activity is monitored by NYPD through DAS. *Id.* ¶ 131.

Individuals affiliated with Wavecrest have allegedly retaliated against Delgado and Roman by photographing them "around their home and at community board meetings." *Id.* ¶ 137. Wavecrest affiliates have also allegedly commented that they are aware of Roman's whereabouts based on the Wavecrest camera footage. *Id.* ¶ 129. Delgado and Roman do not allege any similar interactions with NYPD or any other City agency.

Beyond their building complex and interactions with the private management company, Delgado and Roman allege that they count "dozens of police cameras" on their trips to church, doctors' offices, the pharmacy, and the grocery store. *Id.* ¶ 127. On a single car ride, they are "alerted" by a navigation app to "countless" police cameras and scanners. *Id.* ¶ 126. The two have also allegedly "frequently observed police helicopters hovering over their neighborhood for long periods of time." *Id.* ¶ 128. Because Roman is "aware" of gunshot detectors and cameras around her apartment building, she chooses to cover her face when she leaves home, which is "particularly difficult" because she suffers from asthma. *Id.* ¶ 129. Neither Delgado nor Roman is alleged to own or operate either a firearm or a vehicle in the City, and neither is alleged to be associated with the license plate of any particular vehicle. Furthermore, neither Delgado nor Roman is alleged to have any criminal history or prior arrest with NYPD.

### 3. Andrea Ortiz

Plaintiff Andrea Ortiz ("Ortiz") is a resident of Brooklyn and serves as an education policy organizer. *Id.* ¶ 143. The Amended Complaint alleges that Ortiz passes "DAS cameras" as she runs errands and walks through the neighborhood. *Id.* ¶ 146. On a recent short walk to a nearby bar, Ortiz allegedly counted "fifteen cameras," though the Amended Complaint does not specify whether such cameras were private or NYPD cameras. *Id.* "MTA cameras connected to DAS"

allegedly "track [Ortiz's] movements" when she uses the subway. *Id.* Ortiz is also "concerned" that location data is generated from her transit fares. *Id.*

Ortiz also observes "NYPD school safety agents and security cameras" at "virtually every school she enters." *Id.* ¶ 147. This perceived surveillance allegedly causes Ortiz "ongoing emotional distress," which is "exacerbated by fears that advocacy activities could put children and families she works with at risk of deportation." *Id.* ¶ 150. Additionally, Ortiz now "takes further precautions before attending public demonstrations because DAS surveillance enables the NYPD to link her presence to her work and expose her or the families she represents to retaliation." *Id.* ¶ 151. The Amended Complaint does not allege any specific retaliation by NYPD or any City agency.

Ortiz maintains a "public-facing presence on social media." *Id.* ¶ 152. The Amended Complaint alleges, without elaboration, that Ortiz, like all other Plaintiffs, "regularly makes phone calls and uses internet payment platforms that are known to be monitored by DAS." *Id.* ¶ 153. The Amended Complaint does not allege that Ortiz owns or operates a vehicle or a firearm in the City, or that she is associated with the license plate of any particular vehicle. Furthermore, the Amended Complaint does not allege that Ortiz has any criminal history, was previously arrested by NYPD, or had any specific interactions with NYPD.

## LEGAL STANDARDS

Dismissal under Rule 12(b)(1). The Court must dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it." *Daly v. Citigroup Inc.*, 939 F.3d 415, 425 (2d Cir. 2019) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Canning v. Admin. for Children's Servs.*, 588 F. App'x 48, 49 (2d Cir. 2014) (quoting *Makarova*, 201 F.3d at 113).

11

While in reviewing a motion to dismiss under 12(b)(1), a court accepts as true the material facts of a complaint, it cannot draw inferences from the complaint in the plaintiff's favor. *J.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004). Furthermore, in resolving a 12(b)(1) motion, the Court "may refer to evidence outside the pleadings." *Makarova*, 201 F3d at 113.

Dismissal under Rule 12(b)(6). To survive a motion to dimiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausible claims are those alleging "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Factual allegations must be more than speculative and must show the grounds upon which a plaintiff is entitled to relief beyond "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Furthermore, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

In its review of a motion to dismiss for failure to state a claim, a court may consider "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). While a Court must accept all well pleaded facts as true, "where 'a document relied on in the complaint contradicts allegations in the complaint, the document . . . control[s], and the court need not accept the allegations in the complaint as true.'" *Noriega v. Abbott Lab'ys*, 714 F. Supp. 3d 453, 457 (S.D.N.Y. 2024) (citation omitted). Furthermore, facts contained on government websites are also subject to judicial notice at the motion to dismiss stage. *Hogan v. Mahabir*, No. 22-cv-07858HGCLP, 2023 WL 3628554, at *4 (E.D.N.Y. May 24, 2023).

12

## ARGUMENT

### POINT I

**PLAINTIFFS LACK ARTICLE III STANDING
BECAUSE THEY FAIL TO ALLEGE HOW
NYPD'S USE OF DAS HAS INJURED THEM
OR HOW THEIR REQUESTED RELIEF WILL
REMEDY THEIR PURPORTED INJURIES**

Article III of the United States Constitution limits a federal court's jurisdiction to deciding actual cases or controversies. U.S. Const. art. III, § 2. Rooted in the traditional understanding of what constitutes a case or controversy, is the doctrine of standing. *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016). This doctrine requires that plaintiffs satisfy three elements—(1) "injury-in-fact," (2) "a causal connection between the injury and the conduct complained of," and (3) that the injury is likely to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation modified). Moreover, "standing is not dispensed in gross"; rather, "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

Plaintiffs fail to establish two of the three elements of standing. First, Plaintiffs fail to allege facts supporting that they have been subjected to and injured by NYPD's use of DAS. Second, Plaintiffs fail to show how their requested relief of declaring DAS unconstitutional and enjoining NYPD from engaging in the purported "DAS surveillance" would redress any alleged injury, since their injuries result from the presence and awareness of surveillance technologies that exist separate from DAS.

### A. Plaintiffs Fail to Establish Injury-in-Fact.

The initial element of standing, injury in fact, requires a showing that plaintiffs have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo,* 578 U.S. at 339 (quoting *Lujan*,

504 U.S. at 560). In assessing whether an alleged injury is "concrete and particularized," courts "assess whether the injury 'affects the plaintiff[s] in a personal and individual way.'" *Baur*, 352 F.3d at 632 (quoting *Lujan*, 504 U.S. at 560 n.1). By doing so, courts ensure that plaintiffs have "a personal stake in the controversy and avoid having the federal courts serve as 'merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding.'" *Id.* (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 473 (1982)). Furthermore, to be "actual or imminent" a plaintiff's alleged injury cannot be "too speculative" and must be "*certainly impending*." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted). Accordingly, "allegations of *possible* future injury are not sufficient" *Id.* (citation modified).

Here, Plaintiffs fail to show an injury-in-fact to support their challenge against DAS under either the Fourth or First Amendments. The Amended Complaint asserts that DAS aggregates multiple technologies and data to "uncover constitutionally protected activity" including "political expression, religious practice, or private association that would be unknowable from any single source," as well as information regarding individuals' movements, that, once aggregated, "giv[es] the NYPD the ability to track individuals across space and time." Am. Compl. ¶¶ 37, 23. Critically, however, Plaintiffs fail to allege factual details regarding how NYPD has employed DAS to collect, store, and aggregate Plaintiffs' *own* personal information. Furthermore, in the context of their First Amendment claim, Plaintiffs fail to plead injury beyond a subjective chilling effect.

### 1. Fourth Amendment Claim

Injury-in-fact in the context of government surveillance under the Fourth Amendment requires that plaintiff suffered a direct injury—i.e., that the government unlawfully obtained private information—as a result of the challenged surveillance. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 148 (2d Cir. 2011) (holding that plaintiffs lacked standing to

14

challenge the government's allegedly unlawful acquisition of financial records, where they failed to allege facts to support that their records were among those acquired). Such injury cannot be based on a "speculative fear" that the government may in the future unlawfully search and seize Plaintiffs' protected information. *See Clapper*, 568 U.S. at 410. Nor can a party "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 416.

Plaintiffs allege that through DAS, NYPD collects and aggregates information on all individuals from various different information-gathering tools to both create a "permanent file of their past" and "project[] their future activities." Am. Compl. ¶ 5. Not only is this unsupported assertion contradicted by NYPD's POST Act disclosures, but it also includes several purported information-gathering techniques that are either completely absent from, or only vaguely alleged in, Plaintiffs' factual allegations.

Indeed, a pattern can be observed throughout the entire Amended Complaint, where Plaintiffs take issue with information purportedly collected and stored in DAS—finger prints, iris scans, x-rays, phone taps, DNA, 911 calls, arrest reports, criminal records, financial and cryptocurrency analysis, and body cam, handheld, dashboard, and aerial camera footage—but fail to allege that Plaintiffs *themselves* have been subjected to such surveillance, or allege any facts, such as a prior arrest or a criminal record, to suggest that such information could have been or will be imminently collected from Plaintiffs and stored in DAS. Furthermore, the limited "DAS surveillance" Plaintiffs vaguely attempt to connect themselves to fails to establish injury.

For example, the Amended Complaint identifies NYPD's ability to access information from LPR technology and ShotSpotter through DAS as key "tracking" tools. Am. Compl. ¶¶ 55-58. But beyond conclusory allegations that Plaintiffs are "recorded" by "trackers, scanners, and

15

electronic monitoring technologies as they move about the city by foot, transit and car," Plaintiffs fail to allege that their information has actually been collected by LPRs, ShotSpotter sensors, or any other purported "sensor" or "tracker," and stored in DAS. *Id.* ¶¶ 111, 126, 145. None of the Plaintiffs allege that they themselves own or operate a vehicle in the City, are associated with the license plate number of a particular vehicle, or that the license plate of such vehicle has been recorded by an LPR. *See Scholl v. Illinois State Police*, 776 F. Supp. 3d 701, 709 (N.D. Ill. 2025) (finding plaintiffs had standing to challenge the use of automated license plate readers or "ALPRs" where plaintiffs alleged they "regularly drive . . . using the same personal vehicle . . . in areas covered by [the challenged] ALPR system"). Nor do Plaintiffs allege that they operate, or even own, a firearm in the City whose gunshot activity would trigger ShotSpotter detectors and result in a gunfire event accessible through DAS. *See* ShotSpotter Impact and Use Policy at 4. Indeed, Plaintiffs are only alleged to be "aware" of the presence of gunshot detectors. Am. Compl. ¶¶ 112, 129.

Similarly, Plaintiffs vague allegations that they are "aware" of and "concerned" regarding the surveillance of their online activity, including social media accounts and phone calls, fail to establish injury. *See, e.g.*, *id.* ¶¶ 117, 133, 152. While Roman and Ortiz are alleged to have a "public-facing presence on social media," they fail to provide details regarding what accounts they own and maintain and how or when DAS "recorded" any postings from such accounts. Am. Compl. ¶¶ 133, 152.[11] And even if Plaintiffs had provided such details, they fail to explain how NYPD's ability to observe posts that Plaintiffs willingly share online for the billions of social media users amounts to any injury.

---

[11] Notably, social media analysis software is not listed as a technology that collects information accessible through DAS. *See generally*, DAS Impact and Use Policy Statement.

16

Furthermore, while all Plaintiffs are alleged to "make phone calls and use internet payment platforms that are known to be monitored by DAS," the Amended Complaint provides no details regarding what phone calls or internet payments were monitored, how DAS monitored these transactions or calls, or when such purported surveillance was conducted. Am. Compl. ¶¶ 131, 118, 153. With respect to the Amended Complaint's unsupported theory that DAS surveils all NYCHA residents by providing free internet services through private internet service providers, it fails to allege facts to explain how and when DAS allegedly surveilled Delgado and Roman's internet activity, and what activity was surveilled. *Id.* ¶ 130. Indeed, Delgado and Roman are only alleged to be "aware" of this monitoring, and "avoid" utilizing the free internet provided. *Id.*

With respect to CCTV cameras, Plaintiffs generally allege that they are recorded by "DAS cameras" as they move throughout the City. *See, e.g.*, *id.* ¶ 111. But Plaintiffs fail to explain how this limited recording in areas open and accessible to the public constitutes injury. Furthermore, while footage from CCTV cameras is accessible to certain authorized NYPD personnel through DAS, it cannot be downloaded or stored in DAS. *See* DAS Impact and Use Policy at 5. Instead, only thirty days of footage exists on device hard drives which automatically overwrite previously recorded video. *See* CCTV Impact and Use Policy at 7. And despite Plaintiffs' assertion that officers can use computer vision software to "follow[] a person from one camera to the next based on descriptors as simple as the color of a piece of clothing," Am. Compl.¶ 25, CCTV cameras do not use video analytics or biometric measurement technologies that could make such computer "tracking" possible. *See* CCTV Impact and Use Policy at 10. Nor do Plaintiffs allege facts to support that they have actually been "watched" or "tracked" by NYPD officers.

Some Plaintiffs further allege the presence of CCTV cameras recording the exterior of their homes, with a field of vision to their windows, that NYPD could access through DAS. Am. Compl.

17

¶¶ 119, 134. However, to arrive at Plaintiff's alleged injury of their private moments being watched and recorded through DAS requires multiple unlikely assumptions, including that NYPD personnel (1) are granted access to live camera footage through DAS to observe the exterior of Plaintiffs' home; (2) spend days observing footage of the exterior of Plaintiffs' home; and (3) manually record any activities that they are able to observe. This "highly attenuated chain of possibilities" cannot satisfy the injury-in-fact requirement. *See Clapper*, 568 U.S. at 410.

At bottom, Plaintiffs' purported injuries are based on the theory that NYPD *could* have collected information regarding Plaintiffs, and such information to uncover constitutionally protected information regarding their private lives. Yet, the allegations lack key factual details connecting Plaintiffs to the purported DAS surveillance that could make this possible and, at best, consist of conclusory allegations that Plaintiffs' private data was obtained. *See Baur*, 352 F.3d at 637 ("[A] plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing."). Plaintiffs' vague assertions that NYPD *may* have collected or *will* collect information regarding Plaintiffs in the future through DAS, in direct contradiction of DAS's technological limitations and the policies and procedures that govern its use, are not enough to establish concrete injury.

## 2. First Amendment Claim

To meet the injury-in-fact element of standing for a First Amendment claim, "[a] plaintiff must allege something more than an abstract, subjective fear that his rights are chilled in order to establish a case or controversy." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) (citing *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). Plaintiffs must allege that their First Amendment rights have been "regulated, constrained or compelled directly by the government's actions"—i.e., that the government has taken or will take some action to restrict plaintiff's protected expression. *Am. C.L. Union v. Nat'l Sec. Agency*, 493 F.3d 644, 661 (6th Cir. 2007); *see*

18

*also Cerame v. Slack*, 123 F.4th 72, 81 n.12 (2d Cir. 2024) ("[T]he standing inquiry ultimately boils down to whether there is a credible threat of enforcement against a plaintiff.").

In the context of alleged government surveillance, the Supreme Court has held that allegations of First Amendment infringement based on "the mere existence, without more, of a governmental investigative and data-gathering activity" do not plead sufficient injury for standing. *Laird v. Tatum*, 408 U.S. 1, 10 (1972). In *Laird*, plaintiffs alleged that they were the subject of federal surveillance while engaged in lawful political activity, and that the information gathered was stored on a computer database and disseminated. *See id.* at 2-3, 6; *see also Fifth Ave. Peace Parade Comm. v. Gray*, 480 F.2d 326, 331 (2d Cir.1973). Because plaintiffs' allegations of injury stemmed solely from their knowledge that the government was engaged in certain surveillance and data collection, or from their fear of actions that the government *may* take action in the future based on information gathered, rather than a claim of specific present harm or a threat of specific future harm, the Supreme Court held plaintiffs failed to present a justiciable controversy. *Laird*, 408 U.S. at 10-11.

Following *Laird*, courts have routinely held that First Amendment challenges based solely on a purported, subjective chilling effect, rather than actual governmental constraint or the threat of such constraint, fail to present a justiciable claim. *See, e.g.*, *Clapper*, 568 U.S. at 418 (finding plaintiffs lacked standing to challenge law authorizing federal surveillance of communications with foreign individuals based on alleged harm that the government may intercept plaintiffs' calls with foreign contacts in the future); *Gray*, 480 F.2d at 330–33 (finding organizers of anti-war protest who alleged that an FBI investigation chilled their First Amendment rights by data collection and dissemination failed to show specific harm); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378-1380 (D.C. Cir. 1984) (holding that allegations that

19

plaintiffs were likely to be targets of unlawful surveillance by the NSA did not satisfy the injury-in-fact requirement); *Handschu v. Special Servs. Div.*, 475 F. Supp. 2d 331, 354 (S.D.N.Y. 2007), *vacated on other grounds,* No. 71 CIV. 2203(CSH), 2007 WL 1711775 (S.D.N.Y. June 13, 2007) (noting that allegations that protesters were photographed and videotaped by NYPD while protesting "fall well short of articulating a justiciable constitutional claim").

*Laird* and its progeny warrant dismissal of Plaintiffs' First Amendment claim. Plaintiffs allege an awareness of purported DAS surveillance technology and assert, without factual support, that their "activism and associations have placed them under heightened scrutiny" which in turn "chill[s] their ability to exercise their rights freely." Am. Compl. ¶¶ 110, 125. Critically, however, Plaintiffs fail to identify any actual threat of governmental constraint or restriction of protected First Amendment activity, citing only to the fear that their activity may in some way be recorded by NYPD through DAS. *See, e.g.*, *id.* ¶ 132 (alleging Roman "curtail[s]" her public social media activity, hesitates to gather in groups or engage in public or online expressions, and limits associations with advocates for fear of being "monitored by DAS."). Plaintiffs do not allege that they have been personally subjected to or fear being subjected to any enforcement, arrest, fine, physical harm, professional harm, or any other action by NYPD that would constitute a "concrete harm . . . apart from the 'chill' itself." *See Reagan*, 738 F.2d at 1378 (collecting Supreme Court cases that found a concrete injury warranting a "chilling effect," such as denial of a professional license, discharge from employment, denial of mail delivery, or threat of employment dismissal for failure to take an oath). At best, some Plaintiffs allege an unspecified and unsupported fear of "retaliation," but provide no details regarding what retaliation they would face or that NYPD has threatened retaliation against them. *See* Am. Compl. ¶¶ 117, 132. Plaintiffs' allegations of a chilling effect based solely on the existence of purported DAS information-gathering and

20

conclusory statements of future harm are "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird*, 408 U.S. at 14.

Moreover, many of Plaintiffs' fears appear to be based on the actions of third parties and the threat of future harm to non-plaintiffs. With respect to Roman and Delgado, the purported fear of retaliation arises from the actions of the private company Wavecrest, and not NYPD or another City agency. *See* Am. Compl. ¶ 137. Similarly, Ortiz reports a speculative fear that her advocacy could place the children and families she works with at risk of deportation by federal immigration officers, but does not allege a risk that NYPD or the City will retaliated against her. *See id.* ¶¶ 149-50.

Plaintiffs' vague allegations of government observation and surveillance, even of protected activity such as protesting or advocacy, without more, does not constitute First Amendment injury. *See Gray*, 480 F.2d at 330–33; *Handschu* 475 F. Supp. 2d at 354. Nor can Plaintiffs claim that their purported injuries such as the perceived loss of enjoyment and value of their home, emotional distress, or self-inflicted injuries suffered while attempting to avoid surveillance, (e.g., wearing welding sunglasses in public, or a mask despite having asthma), constitutes sufficient injury where this injury stems solely from government information-gathering, and not the "imminence of concrete, harmful action such as threatened arrest for specifically contemplated First Amendment activity." *See Reagan*, 738 F.2d at 1380. Because Plaintiffs fail to allege a First Amendment injury beyond an "awareness" that "their activism and associations have placed them under heightened scrutiny, chilling their ability to exercise their rights freely" Am. Compl. ¶¶ 110, 125, they lack standing to bring any First Amendment challenge.

## B.  Plaintiffs Fail to Establish Redressability.

"Redressability requires that it 'be likely, as opposed to merely speculative, that [the plaintiff's alleged] injury will be redressed by a favorable decision.'" *Lovell v. Consol. Edison Co.*

21

*of N.Y.*, 758 F. App'x 222, 224 (2d Cir. 2019) (quoting *Lujan*, 504 U.S. at 561). Broad challenges to government programs, rather than challenges to the specific actions that directly cause plaintiffs harm present "obvious difficulties insofar as proof of causation or redressability is concerned." *Lujan*, 504 U.S. at 568. Furthermore, where the harm purportedly caused predates the challenged action or program, plaintiffs fail to show redressability. *See G.B. v. Nassau Cnty.*, 751 F. Supp. 3d 56, 66 (E.D.N.Y. 2024) (finding plaintiffs' challenge to a local law preventing the use of masks under certain circumstances, which relied on harm that predated the enactment of the law, failed to establish redressability).

Here, Plaintiffs' alleged injuries do not purport to result from the allegedly all-encompassing surveillance that DAS performs. Indeed, Plaintiffs themselves have not been subjected to the slew of alleged DAS information gathering techniques that purportedly allows for such surveillance. Rather, Plaintiffs allege injury based on their "awareness" or perception of surveillance technologies. *See, e.g.*, Am. Compl. ¶ 110. For example, Plaintiffs' "emotional distress" or decision to wear coverings in public that cause discomfort, allegedly results from their knowledge that surveillance technologies, particularly cameras, are present and that NYPD could access information from them. *See, e.g., id.* ¶ 114, 120, 139, 150. Even where Plaintiffs have "tint[ed] their windows" to block a cameras view, because they could allegedly still "see the cameras from inside their home" they purportedly suffered "persistent psychological distress." *Id.* ¶ 121. Accordingly, eliminating or curtailing NYPD's use of DAS will not alleviate Plaintiffs' injury. If NYPD entirely discontinued the use of DAS, CCTV cameras, such as the ones challenged by Plaintiffs, and other surveillance technologies would still exist, and information gathered from such technologies could still be accessible to NYPD. Additionally, with respect to Roman and Delgado, the purportedly invasive recording of their home, photographing of their movements,

22

and threats of retaliation all occurred at the hands of the private company, Wavecrest, which is not

a party to this action and is unaffected by its outcome. *See id.* ¶¶ 129, 134, 137. Accordingly,

Plaintiffs fail to establish that their purported injury will likely be redressable by a favorable

decision, and they therefore lack standing to bring their claims. *See Lujan*, 504 U.S. at 561.

**POINT II**

**PLAINTIFFS FAIL TO STATE A FOURTH
AMENDMENT CLAIM**

**A.  The Alleged DAS Surveillance Does Not Give Rise to a Fourth Amendment Claim.**

Even if Plaintiffs had standing to bring their Fourth Amendment claims, they fail to

plausibly allege any data collection that constitutes a Fourth Amendment search or seizure.

The Fourth Amendment protects individuals from "unreasonable searches and seizures" by

the government. However, not all government surveillance implicates the Fourth Amendment. *See*

*United States v. Harry*, 130 F.4th 342, 347 (2d Cir. 2025). Rather, to plead a search or seizure, a

plaintiff must have "a justifiable, a reasonable, or a legitimate expectation of privacy that has been

invaded by government action." *United States v. Knotts*, 460 U.S. 276, 280 (1983) (citation

modified).

Plaintiffs do not have a protected privacy expectation in what they "knowingly expose[] to

the public through an open door or window." *United States v. Davis*, 326 F.3d 361, 365 (2d Cir.

2003); *Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the

public, even in his own home or office, is not a subject of Fourth Amendment protection"). Indeed,

the Fourth Amendment "has never been extended to require law enforcement officers to shield

their eyes when passing by a home on public thoroughfares" notwithstanding an individual's

attempt to "take[] measures to restrict some views of his activities." *California v. Ciraolo*, 476

U.S. 207, 213 (1986). With the advancement of modern technology, courts have recognized that

23

law enforcement's use of "generally available technology," such as video cameras, to enhance their surveillance abilities from public viewpoints, does not constitute an unconstitutional search. *United States v. Hay*, 95 F.4th 1304, 1314 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 591, 220 (2024). For this reason, courts, routinely hold that the warrantless use of technology to collect information that an individual knowingly exposes to the public does not rise to the level of a Fourth Amendment violation. *See, e.g.*, *Harry*, 130 F.4th at 347 (collecting cases holding that the use of pole cameras to surveil a suspects home or business does not constitute a Fourth Amendment search); *Ciraolo*, 476 U.S. at 213 (finding that the warrantless observation of an individual's back yard from airplanes flying over the property did not violate the Fourth Amendment) *Rinaldi v. Sylvester*, No. 24-CV-272 (KMK), 2025 WL 2682691, at *18 (S.D.N.Y. Sept. 19, 2025) (holding that the collection of license plate reader (LPR) data and queries of LPR databases do not amount to a Fourth Amendment search).

Plaintiffs fail to state a Fourth Amendment claim because they fail to plausibly allege any observation beyond what they have knowingly exposed to the public by law enforcement through generally available technology—i.e., that they are recorded by CCTV cameras in public spaces throughout the City. Even Plaintiffs' allegations that CCTV cameras record the exterior of their homes fail to establish a Fourth Amendment search. While privacy expectations are heightened in an individual's home, law enforcement may still lawfully observe what is visible to the public through an open door, window, or open yard, without obtaining a warrant. *See Ciraolo*, 476 U.S. at 213. Rather, it is only where the "[g]overnment uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion" that the Fourth Amendment is implicated. *Kyllo v. United States*, 533 U.S. 27, 40 (2001) (finding that the government's use of a thermal imaging camera to observe details inside the

24

subject's home that would be impossible to observe without physical intrusion constituted a search). Though Plaintiffs allege that the cameras are able to "peer[] into the interior of their home" through an open window Am. Compl. ¶¶ 119, 134, they fail to allege that the cameras are able to explore details of their home that would not be observable from a public vantage point. *See Hay*, 95 F.4th at 1314 (finding that pole camera which incidentally captured activity inside the subject's house from a public vantage point did not violate the Fourth Amendment).

Moreover, Plaintiffs' allegations beyond the presence of cameras fail to plead a Fourth Amendment violation. For example, allegations of Plaintiffs' "concern[s]" that NYPD, through DAS, is able to be observe posts shared on public social media platforms by Plaintiffs lacks key details regarding what social media accounts were surveilled, whether Plaintiffs owned and operated the accounts, how and when the accounts were surveilled through DAS, and what information was collected. *See* Am. Compl. ¶¶ 133, 152. Even assuming Plaintiffs had adequately alleged that NYPD had collected information posted on a public social media account, where a "user disseminates [their] postings and information to the public, they are not protected by the Fourth Amendment." *United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012) (citing *Katz*, 389 U.S. at 351). Similarly, Plaintiffs conclusory allegations that DAS surveils their internet activity, including payment platforms, and phone calls, without any factual details regarding how DAS surveils such activity, what activity was surveilled, and when such surveillance took place fails to adequately state a Fourth Amendment search or seizure.

Because Plaintiffs fail to adequately allege that they have been subjected to any observation and data collection by law enforcement in DAS beyond what they have knowingly exposed to public view, their Fourth Amendment claim must fail.

**B. Plaintiffs' Allegations Do Not Plead the Fourth Amendment Violations Recognized by *Carter* and its Progeny.**

Perhaps aware of the weakness of their claims, Plaintiffs attempt to plead the type of Fourth Amendment violation recognized by the Supreme Court in *Carpenter v. United States*, 585 U.S. 296 (2018) by alleging that the purportedly "widespread and persistent warrantless DAS surveillance . . . infringes upon a reasonable expectation of privacy in whole of the movements of Plaintiffs and the class and captures information about their privacies of life." Am. Compl. ¶ 175. But Plaintiffs' allegations regarding the DAS surveillance they have been purportedly subjected to are a far cry from the retrospective tracking of an individual's exact whereabouts over an extended period of time that the Supreme Court cautioned against in *Carpenter*.

In *Carpenter*, the Supreme Court held that the government's collection of retrospective cell-site location information ("CSLI") from an individual's personal cell phone for a period of 127 days from one carrier, and seven days from another, constituted a Fourth Amendment search. *Carpenter*, 585 U.S. at 316. In reaching this conclusion, the Court noted how a cellphone is akin to an ankle monitor in that it "tracks nearly exactly the movements of its owner" and therefore, with CSLI, the government can retrace an individual's *exact* whereabouts over an extended period of time. *Id.* at 311. Indeed, the Court cautioned that its ruling in *Carpenter* was "a narrow one" that did not "call into question conventional surveillance techniques and tools, such as security cameras." *Id.* at 316.

Unsurprisingly, following *Carpenter*, courts, including the Second Circuit, have continued to uphold law enforcement's use of surveillance techniques, such as video cameras, without a warrant. *See Harry*, 130 F.4th at 350-51; *see also United States v. Dennis*, 41 F.4th 732, 741 (5th Cir. 2022) (holding that government's warrantless pole camera surveillance of front and back of subject's home for over two months did not invade a protected privacy interest, despite subject

26

erecting protective fences); *United States v. Tuggle*, 4 F.4th 505, 514 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 1007 (2022) (holding that use of pole camera to surveil a suspect's house for eighteen months did not constitute a Fourth Amendment "search"). Courts have distinguished technology like cameras and LPRs that capture a person's activity at specific places and specific times as meaningfully different from historical cell-site records that allow for "'near perfect surveillance' that could create 'an all-encompassing record' of [an individual's] whereabouts." *Rinaldi*, 2025 WL 2682691, at *18 (quoting *Carpenter*, 585 U.S. at 311-312); *Harry*, 130 F.4th at 350.

While the Amended Complaint makes conclusory allegations that DAS is able to "track individuals across space and time" it is devoid of factual allegations to support that DAS is actually capable of such surveillance, much less that Plaintiffs themselves have been subjected to such surveillance. Am. Compl. ¶ 23. In fact, Plaintiffs' theories regarding DAS capabilities and use directly contradict the impact and use policies regarding DAS and other NYPD technologies. *See supra* at 2-6. At most, Plaintiffs allege that CCTV cameras may have incidentally captured their movements at a specific moment and specific location, but Plaintiffs fail to allege how such recordings "paint[s] the type of exhaustive picture of [their] every movement[s] that the Supreme Court has frowned upon [in *Carpenter*]." *Tuggle*, 4 F.4th at 524.

### POINT III

### PLAINTIFFS FAIL TO STATE A FIRST AMENDMENT CLAIM

Even if the Court determines that Plaintiffs have standing to challenge the surveillance that Plaintiffs have been allegedly subjected to under the First Amendment, Plaintiffs must still allege cognizable injury beyond "mere surveillance by government authorities" to plead a First Amendment claim based on a purported chilling effect. *See Nour v. New York City Police Dep't*, No. 92 CIV. 7066 (JFK), 1995 WL 42319, at *3 (S.D.N.Y. Feb. 2, 1995) (citing *Laird*, 408 U.S.

at 13). This Court has recognized that to "establish such a constitutional violation, a plaintiff must show both that a government investigation discouraged him from exercising his First Amendment rights, and that he suffered a concrete and demonstrable injury as a result." *Gaston v. Gavin*, No. 97 CIV. 1645 (JGK), 1998 WL 7217, at *4 (S.D.N.Y. Jan. 8, 1998), *aff'd*, 172 F.3d 37 (2d Cir. 1998). Critically, this injury must be objective, as allegations of "mental anguish emotional distress, fear, and pain" from government surveillance are insufficient to allege an objective First Amendment harm. *Nour*, 1995 WL 42319, at *3.

Plaintiffs fail to allege any First Amendment harm beyond their subjective chilling effect or injuries stemming from their subjective chilling effect. Plaintiffs fail to plausibly allege that they have personally subjected to the purported DAS surveillance and data aggregation that allegedly allows NYPD to uncover intimate information regarding an individual's beliefs and associations. *See supra* at 15-18. Nor do they allege any impending injury that would result—such as an arrest, physical harm, pecuniary harm, etc.—even if DAS could somehow collect and aggregate this information regarding Plaintiffs. Rather, Plaintiffs, at best, solely allege that they have altered their behavior and expression for fear of being been recorded by DAS, and that this has chilled their First Amendment expression. These allegations do not constitute a First Amendment claim. *Laird*, 408 U.S. at 13–14 ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"); *Handschu* 475 F. Supp. 2d 331, 355 (S.D.N.Y. 2007) (finding no First Amendment claim based solely upon "NYPD practices of videotaping and photographing demonstrators.").

## POINT IV

### PLAINTIFFS FAIL TO PLEAD MUNICIPAL LIABILITY

Where claims under 42 U.S.C. § 1983 are against a municipality, rather than an individual employee, the plaintiff must adequately allege that the constitutional deprivation was caused by the municipality's official policy or custom. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, (1978). This requires that a plaintiff "set forth sufficient factual content" that establishes the existence of a municipal custom or policy resulting in the purportedly unconstitutional conduct. *Norton v. Town of Islip*, 678 F. App'x 17, 21 (2d Cir. 2017). "[B]oilerplate allegations" such as "allegations that a defendant acted pursuant to a policy; without any facts suggesting the policy's existed, are plainly insufficient. *Rivera v. Putnam Cnty.*, No. 22 CV 1877 (VB), 2023 WL 3601720, at *9 (S.D.N.Y. May 23, 2023) (citation modified).

Plaintiffs allege that "DAS has made a policy and practice of subjecting the entire city to extraordinary warrantless police surveillance." Am. Compl. ¶ 6. Indeed, Plaintiffs' theory of the case rests on the premise that DAS incorporates endless tracking, sensor, and AI technology to "map out" the movements, relationships, religious beliefs, and political affiliations of every single New Yorker. *Id.* ¶¶ 22-23. Yet, Plaintiffs fail to identify specific City policies, informal or otherwise, that support this implausible theory, and the policies Plaintiff's do identify—NYPD's impact and use policies—contradict their theories. *See supra* at 2-6.

## POINT V

### PLAINTIFFS' STATE CONSTITUTIONAL CLAIMS FAIL

In addition to Plaintiffs' lack of standing and failure to adequately plead a privacy or free speech violation, Plaintiffs' claims under the New York State Constitution must be dismissed because Plaintiffs have an alternative remedy under 42 U.S.C. § 1983. *See Allen v. Antal*, 665 F.

App'x 9, 13 (2d Cir. 2016). Courts in this circuit have "uniformly held that no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution." *Alwan v. City of New York*, 311 F. Supp. 3d 570, 586 (E.D.N.Y. 2018) (collecting cases); *Talarico v. Port Auth. of New York & New Jersey*, 367 F. Supp. 3d 161, 171 (S.D.N.Y. 2019) ("[W]here a complaint alleges no theories of liability that are cognizable exclusively under the New York State Constitution, any claims brought under the state constitution are ordinarily dismissed."). Because Plaintiffs only allege violations under the New York State Constitution under the right to privacy and freedom of expression provisions that are parallel to their First and Fourth Amendment claims under Section 1983, their state law claims must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss the Amended Complaint with prejudice, and grant Defendant such other and further relief that the Court deems just and proper.

Dated:        New York, New York
              June 4, 2026

**Steven Banks**
Corporation Counsel of the
City of New York
*Attorney for Defendant*
100 Church Street
New York, New York 10007

By:    /s/ Andrea Liberatore
       Andrea Liberatore
       *Assistant Corporation Counsel*
       (212) 356-3187
       aliberat@law.nyc.gov

## CERTIFICATE OF COMPLIANCE

Counsel of Record hereby certifies that this brief complies with the page limitations set forth in Rule 2B of the Court's Individual Practices, as modified pursuant to this Court's order (ECF No. 26).  Excluding the cover page, caption, any index, table of contents, table of authorities, signature blocks, and required certificate, but including material contained in footnotes, this brief is no longer than 30 pages.

Dated:        New York, New York
              June 4, 2026

                                        **Steven Banks**
                                        Corporation Counsel of the
                                        City of New York
                                        *Attorney for Defendant*
                                        100 Church Street
                                        New York, New York 10007

                        By:      /s/ *Andrea Liberatore*
                                 Andrea Liberatore
                                 *Assistant Corporation Counsel*
                                 (212) 356-3187
                                 aliberat@law.nyc.gov